United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| GOOGLE LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>POINT FINANCIAL, INC.,<br><br>        Defendant. | Case No. 5:25-cv-04033-BLF<br><br>**ORDER GRANTING TEMPORARY RESTRAINING ORDER AND ORDERING DEFENDANT TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**<br><br>[Re: ECF No. 3] |

       Plaintiff Google LLC ("Google") seeks to enjoin Defendant Point Financial, Inc. ("PFI") from (1) interfering with Google's contractual relationships with non-party CNEX and certain vendors with which Google works to manufacture and test ▮▮▮▮▮▮▮▮ used in its servers, and (2) "taking possession of and/or selling to Google's competitors software and equipment containing Google's intellectual property and trade secrets." Dkt. No. 3-1 at 1. On May 8, 2025, Google filed this lawsuit as well as a Motion for a Temporary Restraining Order and Preliminary Injunction. Dkt. Nos. 1 ("Compl."), 3 ("Mot."). Pursuant to the Court's order setting a briefing schedule on the motion, Dkt. No. 11, PFI filed an opposition brief, Dkt. No. 30 ("Opp."), and Google filed a reply, Dkt. No. 32 ("Reply"). The Court held a hearing on Google's motion on May 19, 2025, Dkt. No. 35, at which the Court issued an injunction from the bench. This Order memorializes the Court's ruling.

       As discussed on the record at the TRO hearing, the Court ORDERS Defendant PFI to SHOW CAUSE why a preliminary injunction should not issue on July 10, 2025 at 9:00 a.m. in Courtroom 1 of the Robert F. Peckham Federal Building & United States Courthouse, located at 280 South 1st Street, San Jose, CA 95113.

### I. BACKGROUND

Google is a multinational technology company with billions of users, many of whom store information on ▮▮▮▮ ("▮▮▮") ▮▮▮▮▮▮. Mot., Ex. 3 ¶¶ 3–4. To protect the information stored on these drives, Google must periodically update its security hardware, software, and protocols. *Id.* ¶ 7. These updates require significant investment of financial resources and engineering time, *id.* ¶ 8, and also sometimes involve work by outside companies, *id.* ¶ 9.

This case involves such an external partnership. On August 2, 2016, Google entered into a Master Purchase Agreement ("MPA") with a company called CNEX Labs, Inc. ("CNEX"), which had been founded in 2013. Mot., Ex. 2 ¶ 8; Mot., Ex. 4. Pursuant to that agreement, CNEX was ▮▮▮▮▮▮ ("▮▮▮▮▮▮") ▮▮▮▮▮▮. Mot., Ex. 2 ¶¶ 9–11. Three years later, in September of 2019, Google and CNEX entered into Statement of Work No. 1171292 ("SOW") for the "▮▮▮▮▮," which would involve ▮▮▮▮▮▮ "▮▮▮▮" Mot., Ex. 2 ¶¶ 13–14; Mot., Ex. 5. Thereafter, the SOW was amended multiple times. *E.g.*, Mot., Ex. 6; Opp., Exs. A, C, D, E. CNEX and Google were also parties to a non-disclosure agreement, Mot., Ex. 7, in addition to confidentiality provisions set out in the MPA, Mot., Ex. 4 § 11.

The ▮▮▮▮▮ needed to be ▮▮▮▮▮▮, so Google provided certain intellectual property to CNEX to assist in development of the product, including "▮▮▮▮▮▮," and "▮▮▮▮▮▮" of the ▮▮▮▮. Mot., Ex. 3 ¶¶ 11–14. Google also communicated various ▮▮▮▮ for the ▮▮▮▮, including "▮▮▮▮▮, ▮▮▮▮, and ▮▮▮▮." *Id.* ¶ 16. Although Google shared this information for purposes of the project, the initial MPA between Google and CNEX stated that "▮▮▮▮▮▮▮▮▮" Mot., Ex. 4 § 11.3.

1   As CNEX commenced work on the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, it regularly
2   reported back to Google on its progress. Mot., Ex. 3 ¶¶ 32–33. CNEX and Google also
3   collaborated engineering and test runs, *id.* ¶ 34, and both CNEX and Google communicated with
4   various vendors that helped to manufacture and test the ▮▮▮▮▮▮▮▮, *see* Mot., Ex. 2 ¶¶ 21–27.
5   Specifically, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("▮▮▮▮▮▮") ▮▮▮▮▮▮▮▮▮
6   ▮▮▮▮, *id.* ¶ 24, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("▮▮▮▮▮▮") ▮▮▮▮▮▮▮▮▮▮▮
7   ▮▮▮▮, *id.* ¶ 26, and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("▮▮▮") ▮▮▮▮▮▮▮▮▮
8   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, *id.* ¶ 27; *see also* Mot., Exs. 8, 9, 10.
9   Google entered directly into agreements with each of these vendors, Mot., Exs. 8, 9, 10, though
10  CNEX received the ▮▮▮ orders from Google and relayed them to the vendors for production and
11  testing, Mot., Ex. 2 ¶ 22.
12  After several years of working together with Google on the ▮▮▮▮▮▮▮▮▮▮▮▮
13  ▮▮▮▮▮▮, CNEX ceased operations on April 12, 2024, notifying Google of its closure on April 15,
14  2024. Mot., Ex. 2 ¶ 35. Thereafter, Google sought to exercise a provision of the MPA stating that
15  the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ would be
16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17  ▮▮▮▮▮▮▮▮▮. *See* Mot., Ex. 16. That provision states that CNEX granted to Google
18  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21  ▮▮▮▮▮▮.
22  Mot., Ex. 4 § 10.4(C). Accordingly, Google now asserts that "upon the cessation of CNEX's
23  operations, Google received all license and access rights to continue the production of the ▮▮▮▮
24  ▮▮▮ to ensure the completion of the ▮▮▮▮▮▮▮▮." Mot. at 8–9.
25  This dispute arose because, two months after CNEX ceased operations, Defendant in this
26  proceeding contacted Google to assert that it had a security interest in all of CNEX's assets
27  pursuant to a loan from PFI on which CNEX had defaulted. Mot., Ex. 11. PFI asserted that such
28  assets included the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3

1  ▮ used to manufacture the ▮. *See id.* In August 2024, PFI proceeded to contact
2  Google's vendors for manufacturing and testing of the ▮ to instruct them to discontinue using
3  the ▮ and the ▮ to fulfill
4  Google's orders, asserting that to do so would violate PFI's rights. *See* Mot., Exs. 14, 15. Google
5  responded by meeting with its vendors to assure them that it had the right to use the information to
6  continue to produce the ▮ Mot., Ex. 2 ¶¶ 37–42. However, Google believes that PFI intends
7  to continue to instruct "the Vendors that Google does not have the right to manufacture the
8  ▮ using the ▮," and that PFI may attempt to sell the
9  ▮ to Google's competitors. Mot. at 10. Since Google believes
10 those actions are in contravention of its agreements with CNEX and the vendors, Google filed suit
11 and sought a TRO to prevent PFI from taking either action.

## II. LEGAL STANDARD

The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. *See Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) ("[T]he legal standards applicable to TROs and preliminary injunctions are substantially identical." (internal quotation marks and citation omitted)). An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). And "a TRO 'should be restricted to . . . preserving the status quo and preventing irreparable harm just so long as is necessary to hold a [preliminary injunction] hearing and no longer.'" *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974)).

A plaintiff seeking preliminary injunctive relief must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "[I]f a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary

4

United States District Court
Northern District of California

injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted).

### III.  DISCUSSION

#### A. Analysis

##### 1. Likelihood of Success on the Merits

The first *Winter* factor asks whether the Plaintiff is "likely to succeed on the merits" of his claims. *Winter*, 555 U.S. at 20. In this lawsuit, Google asserts three claims for relief against PFI: (1) tortious interference with Google's contractual relationships, (2) violations of the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*, and (3) violations of California's Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.* Google argues that it has shown a likelihood of success on the merits for all three claims.

Google's first claim for tortious interference with contract requires: "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141 (2020). Google argues that it has shown that it has existing contracts with CNEX and the manufacturing and testing vendors. Mot. at 14 (citing Mot., Exs. 4, 8, 9, 10, 16). It further argues that PFI is aware of Google's "license and access rights to the █████████████████████ that Google obtained from CNEX under the MPA and SOWs," and that PFI's communications with the vendors reveal that PFI is aware of Google's contracts with those entities as well. *Id.* (citing Mot., Exs. 14, 15). Accordingly, Google asserts that the content of PFI's emails to the vendors evidences PFI's intentional acts to interrupt or induce a breach of Google's contracts. *See id.* At least one vendor did temporary cease work on the contracts, requiring Google to "█████████ ████████████████████████████" to reassure the vendor of Google's rights to the ████████████ ████████████. *Id.* at 15 (citing Mot., Ex. 2 ¶ 40). This temporary stoppage damaged Google, and Google argues than any further interference could imperil Google's ability to ████████████

5

1  ████████████████████, to ████████████████████, and to ████████
2  ████████████████████████████. *Id.*
3        The Court finds that Google has demonstrated a likelihood of success on the merits of its
4  tortious interference claim. Although PFI is correct that a defendant "cannot be held liable for
5  intentional interference with a contract" under California law if the challenged conduct "was
6  lawful and undertaken to enforce its rights," Opp. at 10 (citing *Cabanas v. Gloodt Assocs.*, 942 F.
7  Supp. 1295, 1306 (E.D. Cal. 1996), *aff'd sub nom. Cabanas v. Gloodt Assocs., Inc.*, 141 F.3d 1174
8  (9th Cir. 1998), and *Webber v. Inland Empire Invs.*, 74 Cal. App. 4th 884, 905 (1999)), the Court
9  concludes that this is not such a case. As Google argues on reply, PFI's right to foreclose on
10 CNEX's assets does not entitle PFI to *greater* property rights than CNEX held with regard to the
11 ████████████████████. *See* Reply at 2. The MPA and SOW ████████████████
12 ████████████████████████, Mot., Ex. 4 § 11.3; Mot., Ex. 5 § 7.2, and
13 ████████████████████████████████████████████████████████████,
14 Mot., Ex. 4 § 10.4. Under that protocol, Google could continue to work directly with the vendors
15 to fulfill ██████████ orders in the wake of CNEX's closure. Indeed, the communications
16 between CNEX executives and vendors in late April 2024 appear to be consistent with this
17 understanding, Mot., Ex. 12; Reply, Exs. 5–7, and the Court is not persuaded by PFI's
18 interpretation—as a stranger to the original contracts—that the agreement contemplated a
19 perpetual royalty arrangement even in the event that CNEX closed. Rather, it appears that PFI,
20 like CNEX, is bound by the agreement that Google had a "perpetual, irrevocable, nonexclusive,
21 worldwide, fully paid-up, royalty-free license" upon CNEX's cessation of business operations.
22 *See* Mot., Ex. 4 § 10.4(C). The Court also finds that Google is likely to succeed in its argument
23 that Google did not invoke the "██████████████," Reply at 3–5, since Google has submitted
24 evidence indicating that CNEX never invoiced Google for royalty payments and did not list
25 royalty payments due from Google in its bankruptcy filings. Reply, Ex. 1 ¶¶ 8–11; *id.* Exs. 3, 4.
26 Therefore, Google has established a likelihood of success on showing that PFI's communications
27 with the vendors, which PFI acknowledges were intentional, were designed to (and did) disrupt
28 Google's contracts, harming Google.

6

Similarly, the Court concludes that Google has shown a likelihood of success on the merits on its federal and state trade secret claims. Courts often analyze claims under the federal Defend Trade Secrets Act and the California Uniform Trade Secrets Act together, because "the elements are substantially similar." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). To succeed on a claim for misappropriation of trade secrets under either act, a plaintiff must prove: "(1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *Nat'l Specialty Pharmacy, LLC v. Padhye*, 734 F. Supp. 3d 922, 929 (N.D. Cal. 2024) (quoting *InteliClear*, 978 F.3d at 657–58) (discussing DTSA); *CytoDyn of New Mexico, Inc. v. Amerimmune Pharms., Inc.*, 160 Cal. App. 4th 288, 297 (2008) ("Under the UTSA, a prima facie claim for misappropriation of trade secrets 'requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff.'").

The Parties dispute whether Google has sufficiently identified a "trade secret" subject to the protection of the DTSA or the CUTSA. It has. The DTSA defines "trade secret" as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
> 
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> 
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). The CUTSA defines "trade secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> 
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
> 
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

7

Cal. Civ. Code § 3426.1(d).  Here, Google has submitted declarations describing the trade secrets at issue in this case as well as its efforts to maintain their secrecy.  Mot., Ex. 3 ¶¶ 13–31.  Based on those declarations, the Court finds that Google has shown a likelihood of success in demonstrating that the materials include at least technical and engineering compilations that Google takes steps to protect, such as by requiring nondisclosure and confidentiality agreements prior to sharing the information.  The secrecy of this information appears to drive economic value for Google via the resulting superior competitive position.  *See id.* ¶¶ 13, 39–42.

The declarants also explain that Google's trade secrets are inextricably intertwined with CNEX's intellectual property in the ▬▬▬, *id.* ¶ 38, such that Google's intellectual property is at risk of disclosure if PFI sells the ▬▬▬.  Although PFI attempts to argue that the amendments to the SOW indicate that the product does not include Google's trade secrets, Opp. at 13, the Court disagrees.  None of the amendments appear to have eliminated the original ▬▬▬—and accompanying confidentiality and nondisclosure requirements—in the MPA.  In light of PFI's repeated statements that it possesses and intends to sell the ▬▬▬, then, PFI has misappropriated Google's trade secrets and threatened harm to Google.  Therefore, the Court concludes that Google has demonstrated a likelihood of success on the merits of its trade secret claims as well.  That said, the Court recognizes that CNEX retained the right to its *own* intellectual property.  Mot., Ex. 4 § 11.3; Mot., Ex. 5 § 7.2.  At this time, Google has submitted persuasive evidence that the entities' intellectual property is intertwined in the ▬▬▬.  But upon proof that CNEX's separately owned rights have been segregated from Google's intellectual property, it is possible that an injunction regarding the ▬▬▬ may be narrowed.

### 2. Irreparable Harm

The second *Winter* factor considers whether the movant "is likely to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  Google argues that it will suffer irreparable harm in the absence of an order restraining PFI from interfering with Google's contractual relationships with the vendors and from selling the ▬▬▬.

Mot. at 19. Specifically, Google argues that it will be unable to complete the ▓▓▓▓▓ on schedule, that it will be unable to "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓" necessary to deploy the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, and that it will suffer reputational damage, among other harms. *Id.* at 20. In addition, Google argues that sale of the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ would publicly release Google's trade secrets, and that it is "well established that the loss of market position and the disclosure of trade secrets can constitute irreparable harm." *Id.* Finally, Google argues that release of the trade secrets at issue in this case would present a security threat. *Id.* PFI responds that Google has not made an adequate showing of irreparable harm because (1) "Google admits . . . that it researched and developed potential alternative methods to provide the same ▓▓▓▓▓▓▓▓▓▓▓▓▓▓" as would be provided by the ▓▓▓▓▓▓▓▓ at issue in this action, and (2) "Google can have its third-party Vendors manufacture the CNEX ▓▓▓▓▓ ▓▓▓ by simply exercising the ▓▓▓▓▓▓▓▓▓▓ Rights and paying the agreed upon royalty." Opp. at 8–9.

Disclosure of trade secrets as well as damage to reputation and market position are irreparable harms. *See, e.g.*, *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 853–54 (N.D. Cal. 2019), *modified in part*, No. 18-cv-07233, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019) ("It is well established that the loss of market position and the disclosure of trade secrets can constitute irreparable harm."); *Comet Techs. United States of Am. Inc. v. Beuerman*, No. 18-cv-01441, 2018 WL 1990226, at *5 (N.D. Cal. Mar. 15, 2018) ("[C]ourts in this district have 'presume[d] that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated.'" (quoting *W. Directories, Inc. v. Golden Guide Directories, Inc.*, No. 09-cv-1625, 2009 WL 1625945, at *6 (N.D. Cal. 2009))); *Citibank, N.A. v. Mitchell*, No. 24-cv-08224, 2024 WL 4906076, at *5 (N.D. Cal. Nov. 26, 2024) ("[A]n intention to make imminent or continued use of a trade secret . . . will almost always certainly show irreparable harm." (quoting *Sun Distrib. Co. v. Corbett*, No. 18-cv-2231, 2018 WL 4951966, at *7 (S.D. Cal. Oct. 12, 2018))); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm."). Google has demonstrated that both threats are present here: PFI's apparent interference with

1    Google's vendor contracts presents a risk of reputational harm, and PFI's assertion that it plans to

2    sell the ███████████████████ presents a significant risk of trade secret disclosure.  In

3    its opposition, PFI does not address either of these two irreparable harms.  Therefore, the second

4    *Winter* factor supports issuance of the requested TRO.

### 3. Balance of Equities

6    The third *Winter* factor considers whether "the balance of equities tips" in the movant's

7    favor.  *Winter*, 555 U.S. at 20.  Google argues that the equities favor granting the requested

8    injunction, because "Google owns licenses and access rights to the ███████████████

9    ██████ and the ███████████████████," and there is "no urgency in the sale" of

10   those materials.  Mot. at 22.  Even if PFI suffered harm as a result of the delayed sale, Google

11   argues that "such harm [would] not outweigh" the harm presented if Google's trade secrets were

12   to be disclosed to a competitor or a "bad actor."  *Id.*  In response, PFI argues that "[e]quity dictates

13   denial of Google's request for an injunction," because Google is a larger company with greater

14   resources at its disposal, so it would be "a far greater hardship to PFI to be deprived of the income

15   stream from the CNEX assets than the hardship to Google" in paying the royalties PFI claims

16   Google owes.  Opp. at 14–15.

17   The Court finds that the equities favor Google.  In focusing on the Parties' respective

18   economic positions, PFI ignores the serious equitable issue presented by wrongful disclosure of

19   trade secrets.  As discussed in the preceding subsection of this Order, such disclosure is widely

20   considered to be an irreparable harm, whereas the potential harm to PFI of a delayed sale is only

21   financial.  And in light of the fact that Google has demonstrated a likelihood of success on the

22   merits of its tortious interference claim, the Court concludes that it is hardly a hardship on PFI to

23   require it to refrain from disrupting Google's contracts.  Accordingly, the Court finds that it is in

24   the interest of equity to require a brief delay of any sale in order to confirm and preserve the

25   Parties' respective contractual and intellectual property rights.  *See Comet Techs*., 2018 WL

26   1990226, at *5 ("[T]he Court finds that granting Plaintiff's TRO will result in little meaningful

27   hardship to Defendant because the TRO 'would essentially only require him to abide by existing

28   law regarding the unauthorized use of another's trade secrets.'" (quoting *Pyro Spectaculars N.,*

1    *Inc. v. Souza*, 861 F. Supp. 2d 1079, 1092 (E.D. Cal. 2012))); *Dish Network L.L.C. v. Ramirez*,
2    No. 15-cv-04712, 2016 WL 3092184, at *7 (N.D. Cal. June 2, 2016) (noting that the balance of
3    hardships favors the movant when it would "do no more than require Defendant to comply with
4    federal and state . . . laws").

### 4. Public Interest

The final *Winter* factor considers whether an injunction is in the public interest. *Winter*, 555 U.S. at 20. Google argues that "[w]hen the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be 'at most a neutral factor in the analysis rather than one that'" militates either in favor of or against granting the injunction. Mot. at 22–23 (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009)). In addition, Google argues that the public interest favors protecting Google's "bargained-for license and access rights to the ▬▬▬▬▬▬▬▬▬▬" and Google's intellectual property rights. *Id.* at 23. PFI does not address this factor of the *Winter* analysis.

The requested injunction is largely limited to the two Parties in this lawsuit, and thus this factor is generally neutral. *See Selecky*, 586 F.3d at 1138–39. In addition, it is in the public interest to protect contractual and statutory rights, and to protect (to the extent possible) against cybersecurity threats. *See Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1078 (N.D. Cal. 2016) ("Similarly, the public interest is served when defendant is asked to do no more than abide by trade laws and the obligations of contractual agreements signed with her employer. Public interest is also served by enabling the protection of trade secrets."). Given the Court's conclusion that Google has shown a likelihood of success on the merits, both concerns are better addressed by Google's position. Therefore, the fourth *Winter* factor also weighs in favor of granting a temporary restraining order.

### B. Security

Under Federal Rule of Civil Procedure 65, "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). District courts are invested "with

11

1  discretion as to the amount of security required, if any." *Jorgensen v. Cassiday*, 320 F.3d 906,
2  919 (9th Cir. 2003) (quoting *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)).
3        PFI requests that the Court set security at $150,000,000.00, which is its claimed value of
4  the CNEX assets as estimated by PFI's President. Opp. at 15 (citing Opp., Ex. F). However, PFI
5  provides no evidentiary support for its purported valuation of the CNEX assets. The declaration
6  from PFI's President does not disclose a proper foundation for the validity of his estimate, and
7  CNEX itself apparently valued the assets at $0 in its bankruptcy filings. *See* Reply, Ex. 3 at 3–4;
8  Reply, Ex. 4 at 5–6. Therefore, the Court estimates that the damage to PFI if it is wrongfully
9  enjoined is limited to the attorneys' fees and costs involved in defending itself against Google's
10 suit. The Court estimates the cost of the legal defense to be $250,000.00 and sets security at that
11 amount.

    **C. Expedited Discovery**

13       The Parties seek expedited discovery in order to ascertain whether CNEX's and Google's
14 respective intellectual property can be effectively segregated, so that PFI can proceed with a
15 foreclosure sale of those assets belonging to CNEX. Expedited discovery may be permitted on a
16 showing of good cause, which "may be found where the need for expedited discovery, in
17 consideration of the administration of justice, outweighs the prejudice to the responding party."
18 *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002). Here, the
19 Parties agree about the need for expedited discovery, and the mutual request is GRANTED.

**IV. ORDER**

21       For the foregoing reasons, PFI and any persons in active concert or participation with PFI,
22 are hereby RESTRAINED, ENJOINED, and ORDERED as follows:
23     1.    PFI is ENJOINED and RESTRAINED from contacting the Vendors and taking any
24 action intended to or having the effect of interfering with Google's license and access rights to the
25 "█████████████████████" (defined at ECF 3-1, pg. 2, lines 8-14, which includes
26 ████████████████████████████████████████████████████████████████
27 ████████████████████████████████████████████████████████████
28 ████████████ (*see* ECF 3, Ex. 4, § 10.4(D)) and its license rights to the "████████

12

1    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (defined at ECF 3-1, pg. 7, lines 13-19; which includes ▮▮▮▮▮▮▮▮

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*see* ECF 3, Ex. 4, § 1.15))

6    or any action intended to disrupt or having the effect of disrupting of the manufacture of the

7    ▮▮▮▮▮▮▮▮; and

8        2.    PFI is ENJOINED and RESTRAINED from taking further possession of the

9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which Google alleges contains its trade secrets, and from

10   disclosing, selling, or licensing the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to any third parties.

11   This Temporary Restraining Order granted on May 19, 2025 at 10:40 a.m. shall expire on

12   July 10, 2025 at 9:00 a.m. unless otherwise extended for good cause or with the consent of all

13   parties.

### ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION

15   Defendant PFI is FURTHER ORDERED to appear in Courtroom 1 of the Robert F.

16   Peckham Federal Building & United States Courthouse, located at 280 South 1st Street, San Jose,

17   CA 95113 on July 10, 2025 at 9:00 a.m. to show cause why a preliminary injunction should not be

18   granted and why Defendant PFI, and any persons in active concert or participation with PFI

19   should not, pending trial, be ENJOINED and RESTRAINED from (a) contacting the Vendors and

20   taking any action intended to or having the effect of interfering with Google's license and access

21   rights to the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and its license rights to the ▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ or any action intended to disrupt or having the effect of disrupting of

23   the manufacture of the ▮▮▮▮▮▮▮ and (b) taking further possession of the ▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮, which Google alleges contains its trade secrets, and from disclosing,

25   selling, or licensing the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to any third parties.

26   This Order to Show Cause and supporting papers shall be served on Defendant PFI no later

27   than June 5, 2025, by hand-delivery or electronically, including email. Any opposition papers

28   shall be filed no later than June 19, 2025, and any reply papers shall be filed no later than June 26,

2025.  If desired, the Parties may work out an alternative briefing schedule and submit it as a stipulation for the Court's approval, so long as the deadline for the reply brief is no later than June 26, 2025.

**IT IS SO ORDERED.**

Dated:  May 22, 2025

_____
BETH LABSON FREEMAN
United States District Judge

14