DALE BISH, (SBN 235390)
**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation
650 Page Mill Road
Palo Alto, CA  94304-1050
Telephone: (650) 493-9300
*dbish@wsgr.com*

THOMAS B. FIDDLER (admitted *pro hac vice*)
MORGAN S. BIRCH (admitted *pro hac vice*)
YUSUF T. YILMAZ (admitted *pro hac vice*)
**WHITE AND WILLIAMS, LLP**
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103
Tel: (215) 864-7000
*fiddlert@whiteandwilliams.com*
*birchm@whiteandwilliams.com*
*yilmazy@whiteandwilliams.com*

*Attorneys for Plaintiff Google LLC*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| GOOGLE LLC, | Case No.: 5:25-cv-04033-BLF |
| Plaintiff, | **GOOGLE LLC'S SUPPLEMENTAL REPLY IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| POINT FINANCIAL, INC., | |
| Defendant. | |

**TABLE OF CONTENTS**

**PAGE**

I. INTRODUCTION ..................................................................................................................1

II. GOOGLE IS ENTITLED TO THE REQUESTED PRELIMINARY INJUNCTION.........1

    A. PFI Does Not Have Rights to Interfere with Google's Contractual Relationships.......1

        1. Google Obtained Its Rights Free From PFI's Security Interest. ..................1

        2. Google Acquired Its Rights In the Ordinary Course of Business. ...............2

        3. Section 10.4 of the MPA Grants Google a License, Not a Security Interest. ...................................................................................................................3

        4. Google Paid Consideration for its Rights. ...................................................4

        5. PFI Unlawfully Interfered with Google's Contractual Relationships CNEX and the Vendors. ........................................................................................5

            a. PFI Interfered with Google's Contracts. ..........................................5

            b. PFI's Interference With Google's Contracts Was Unlawful and Without Justification. .......................................................................5

            c. PFI Was Aware of Google's Contractual Relationships With CNEX and the Vendors. ..............................................................................6

    B. Google's IP is Protected by Express Provisions in the MPA and Cannot Be Disclosed or Assigned to Any Third Party. ............................................................7

        1. PFI Does Not Have Any Rights Under the MPA, Including License Rights to Google's Background IP and Developed IP. ..........................................7

    C. Google Has Produced Extensive and Detailed, Proprietary and Confidential Documents Reflecting the Transfer of its Intellectual Property to CNEX. .............9

    D. PFI's Efforts to Compel Google to Identify its Background IP in CNEX's Assets Is Not Supported by the Facts or the Law............................................................13

    E. The Balance of the Equities Weighs Strongly in Google's Favor. ........................14

    F. This Court should not require a larger bond for the preliminary injunction requested by Google. ............................................................................................14

III. CONCLUSION...................................................................................................................14

# **TABLE OF AUTHORITIES**

Page(s)

**CASES**

*A&I Transp., Inc. v. KG Admin. Servs.*,
  No. 8:19-cv-01992-5B, 2021 U.S. Dist. LEXIS 62910 (C.D. Cal. Jan. 7, 2021) ...................... 7

*Contrarian Funds, LLC v. Woodbridge Grp. of Cos., LLC (In re Woodbridge Grp. of Cos., LLC)*,
  606 B.R. 201 (D. Del. 2019) .................................................................................................. 8

*DVD Copy Control Assn., Inc. v. Bunner*,
  116 Cal.App.4th 241 (2004) .................................................................................................. 9

*Everex Sys. v. Cadtrak Corp. (In re CFLC, Inc.)*,
  89 F.3d 673 (9th Cir. 1996) ................................................................................................... 8

*H.S. Crocker Co. v. McFaddin*,
  148 Cal. App. 2d 639, 307 P.2d 429 (2nd Dist. Div. 3 1957) ............................................... 4

*JJD-HOV Elk Grove LLC v. Jo-Ann Stores, LLC*,
  17 Cal. 5th 256, 560 P.3d 297, 328 Cal. Rptr. 3d 61 (S. Ct. 2004) ...................................... 4

*Louis & Diederich v. Cambridge European Imports*,
  189 Cal.App.3d 1574, 234 Cal ............................................................................................. 3

*Quelimane Co. v. Stewart Title Guaranty Co.*,
  19 Cal. 4th 26, 77 Cal. Rptr. 2d 709, 960 P. 2d 513 (1998) ................................................. 6

*Ramirez v. Charter Communications, Inc.*,
  108 Cal. App. 5th 1297, 330 Cal. Rptr. 3d 211 (2nd Dist. Div. 4 2025) .............................. 4

*San Francisco Newspaper Printing Co. v. Superior Court*,
  170 Cal.App.438, 216 Cal ..................................................................................................... 8

*Scramoge Tech. Ltd. v. Apple, Inc.*,
  669 F. Supp. 3d 826 (N.D. Cal. 2023) .................................................................................. 5

*St. Clair Intellectual Prop. Consultant v. Toshiba Corp.*,
  2015 U.S. Dist. LEXIS 135040 (D. Del. 2015) .................................................................... 5

*Weiss v. Marcus*,
  51 Cal. App. 3d 590, 124 Cal. Rptr. 297 (2nd Dist. Div. 4 1975) ........................................ 6

**STATUTES**

Cal. Civ. Code,
  § 1605.................................................................................................................................4
  § 1638.................................................................................................................................4

Cal. Com. Code
  § 9-321(b)...........................................................................................................................2
  § 120(9)..............................................................................................................................3
  § 1201(9)............................................................................................................................3
  § 9321(c)............................................................................................................................2
  § 10103(10)........................................................................................................................2

I.  INTRODUCTION

In opposing Google's preliminary injunction motion (ECF 3), PFI contends in its Supplemental Response (ECF 66) that its secured creditor status gives it the prerogative to interfere with Google's bargained and paid-for license and access rights to the ███████████ ███████ and Custom Software and Tooling. California law is to the contrary. Google's license and access rights are clear, and PFI's interference with those rights is unlawful and unsupportable.

PFI's argument against Google's trade secret claims disregards the confidential, proprietary, and trade secret information that Google provided to CNEX for the development and manufacture of a ██████ Chip that would be compatible with Google's existing server network (Google's "Background IP"). In discovery, Google produced voluminous documents evidencing the transfer of its Background IP to CNEX. CNEX's rights to the Background IP were contractually limited by the MPA, and PFI's rights to it are non-existent. The MPA expressly denies CNEX the right and power to assign the MPA to any third party, including PFI. Accordingly, while PFI can sell CNEX's intellectual property, it cannot own or sell the ██████ ███████████████████, which contains Google's Background IP, or manufacture the ██████ Chip because CNEX's rights to do so is non-assignable.

In addition to the facts and law, the equities in this case weigh heavily in Google's favor. PFI has disregarded facts and clear law to craft result-oriented arguments aimed at garnering PFI an extraordinary return on the financing it provided to CNEX. Finally, PFI's request for an increased bond in support of Google's requested preliminary injunction is without merit.

II.  **GOOGLE IS ENTITLED TO THE REQUESTED PRELIMINARY INJUNCTION.**

   A.  **PFI Does Not Have Rights to Interfere with Google's Contractual Relationships.**

PFI argues that it has not interfered with Google's contractual relationships because its security interest is superior to Google's license and access rights. Therefore, according to PFI, it is justified in attempting to stop the manufacture of the ██████ Chips for Google. That argument disregards the facts of this case and the clear language of the California Commercial Code.

   1.  **Google Obtained Its Rights Free From PFI's Security Interest.**

1    Google's rights under the MPA are unambiguous. Upon the cessation of CNEX's business,
2    Google received a ███████████████
3    ███████ to the ███████████████████████████████ needed to manufacture the ██████ Chip.
4    *See* ECF 3, Ex. 4, § 10.4(C). Additionally, Google received ████████████████████████
5    ████████████████████████████████████████████████████████████████████████████████
6    ████████████████████████████████████████████████████████████████████████████████
7    *Id.*, § 10.4(D). Google bargained for these rights and would not have entered into the MPA if they
8    were not included in the agreement. *See* ECF 3, Ex. 2, ¶¶ 28-30.
9        Google's rights under the law are as equally clear. A "licensee in ordinary course of
10   business takes its rights under a nonexclusive license free of a security interest in the general
11   intangible created by the licensor, even if the security interest is perfected and the licensee knows
12   of trade secret existence." Cal. Com. Code § 9-321(b). Similarly, "[a] lessee in ordinary course of
13   business takes its leasehold interest free of a security interest in the goods created by the lessor,
14   even if the security interest is perfected and the lessee knows of its existence." Cal. Com. Code
15   § 9321(c). Although the term "lease" is not used in § 10(D) of the MPA, Google's ███████████
16   ███████████████████ are the functional equivalent to a lease. *See* Cal. Com. Code § 10103(10)
17   (lease means "a transfer of the right to possession and to use goods for a term in return for
18   consideration . . ."); *see also* FASB Accounting Standards Codification, 842-10-15-3 (contract is
19   for a lease if it conveys rights to control and use equipment).
20       PFI cannot dispute that Google's license and access rights are nonexclusive. Instead, it
21   incorrectly contends that these rights were not granted in the ordinary course and were granted
22   with no consideration.
23       **2.     Google Acquired Its Rights In the Ordinary Course of Business.**
24       PFI contends that Google did not obtain its license and access rights in the ordinary course
25   of CNEX's business because "CNEX was never in the business of licensing its manufacturing
26   know-how so that others could make products with embedded CNEX firmware." ECF 66, p. 5.
27   That argument takes an overly narrow view of CNEX's business and is unsupported by any citation
28

1   to legal authority.

2   Under the California Commercial Code, a "'[b]uyer in the ordinary course of business'
3   means a person that buys goods in good faith, without knowledge that the sale violates the rights
4   of another person in the goods, and in the ordinary course from a person . . . in the business of
5   selling goods of that kind." Cal. Com. Code § 1201(9). While in operation, CNEX was in the
6   business of developing software and firmware for the manufacture and sale of integrated circuits
7   or computer chips. *See* www.cnexlabs.com (last accessed June 26, 2025). As part of its business,
8   CNEX ▮▮▮▮▮▮▮▮▮▮ to Google (in addition to the ▮▮▮▮▮▮ in § 10.4(C)). ECF 3,
9   Ex. 4, § 10.1. Google's § 10.4 rights were bargained for and included at the inception of the
10  contractual relationship between Google and CNEX. In other words, CNEX provided Google with
11  the ability to continue to receive exactly what CNEX provided to Google under the MPA and
12  SOWs in the event that CNEX went out of business. By definition, these rights were granted in
13  the ordinary course of business.

14  At his deposition, Alan Armstrong, founder and former CEO of CNEX, testified that the
15  MPA, which includes the provision at issue, was "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16  ▮▮▮▮▮▮▮▮▮▮▮" Ex. 1, A. Armstrong Dep., at 24:3-14. He further testified that CNEX
17  had "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id*.

18  Google's license and access rights were not acquired as part of a bulk transaction or as
19  security for total or satisfaction of a money debt. *See* Cal. Com. Code § 120(9). Further, Google
20  did not acquire these rights from a broker or other third party, as is often the case with transactions
21  determined not to be acquired in the ordinary course. *See, e.g., See Louis & Diederich v.*
22  *Cambridge European Imports*, 189 Cal.App.3d 1574, 1587, 234 Cal.Rprt. 889, 896 (6th Dist. 1987)
23  (purchase of car from a nondealer not in ordinary course).

24  **3.  Section 10.4 of the MPA Grants Google a License, Not a Security Interest.**

25  PFI attempts to contort the plain language of the § 10.4(C) ▮▮▮ into a loan and security
26  interest. ECF 66, pp. 6-7. According to PFI, the ▮▮▮ "served as a remedial device allowing
27  Google to obtain and protect the benefit of the funding it advanced to CNEX to pay for

28

1  development costs—by giving Google the means to obtain all rights and know-how to manufacture
2  the CNEX chips for its own use." *Id.* at 7. PFI does not cite any factual support or other authority
3  for this confusing argument.
4      Google did not advance money to CNEX for goods or services to be delivered at some
5  future date. Rather, the payments that Google made to CNEX were ███████████
6  ████████████████████████████████████████████ ECF 3, Ex. 5, § 5.
7  This clear language and the clear language concerning the ██████████ to Google in § 10.4(C)
8  govern the interpretation of the MPA and SOW. *See*, *e.g.*, *JJD-HOV Elk Grove LLC v. Jo-Ann*
9  *Stores, LLC*, 17 Cal. 5th 256, 261, 560 P.3d 297, 299, 328 Cal. Rptr. 3d 61, 63 (S. Ct. 2004) (clear
10
11  contractual language governs interpretation of contract); Cal. Civ. Code § 1638.
12      **4.    Google Paid Consideration for its Rights.**
13      In an effort to further rebut Google's clear rights under § 10.4(C) and (D), PFI argues that
14  Google was obligated to provide "new value" for the ████████████████████
15  ████████████████████████████████, even though it was not required by the MPA.
16  ECF 66, p. 6. PFI's argument that Google owes additional consideration for its § 10.4 rights ignores
17  controlling case law and contradicts the plain language of the MPA and is essentially a plea for
18  this Court to rewrite the MPA. "Courts cannot, however, 'rewrite agreements and impose terms to
19  which neither party has agreed." *Ramirez v. Charter Communications, Inc.*, 108 Cal. App. 5th 1297,
20  1306, 330 Cal. Rptr. 3d 211, 219 (2nd Dist. Div. 4 2025) (citation omitted). Additionally, there
21  cannot be any legitimate dispute that there was substantial consideration for the various covenants
22  in the MPA, including Google's § 10.4 rights. *See* Cal. Civ. Code, § 1605 (defining consideration);
23  *see also H.S. Crocker Co. v. McFaddin*, 148 Cal. App. 2d 639, 644, 307 P.2d 429, 433 (2nd Dist.
24  Div. 3 1957); (holding consideration does not only mean the transfer of money).
25      Google received its ████████████████ under § 10.4(C) and (D) when it entered into
26  the MPA even if those rights did not become effective until CNEX's business closed. *Id*. In the
27  intellectual property field, rights that are granted but that do not come into effect until a future date
28

1  on the occurrence of a specific condition or event are common and known as "springing" rights.
2  *See e.g., St. Clair Intellectual Prop. Consultant v. Toshiba Corp.*, 2015 U.S. Dist. LEXIS 135040
3  at *13 (D. Del. 2015) (discussing "springing license" that would go into effect at some future date,
4  under specific conditions); *see also Scramoge Tech. Ltd. v. Apple, Inc.*, 669 F. Supp. 3d 826 (N.D.
5  Cal. 2023) (discussing springing licenses).

      **5. PFI Unlawfully Interfered with Google's Contractual Relationships CNEX and the Vendors.**

      **a. PFI Interfered with Google's Contracts.**

9  PFI cannot legitimately assert that it has not interfered with Google's contract with CNEX;
10 and its contracts with the Vendors, who continued to manufacture the ▮▮▮ Chips after CNEX
11 ceased its business operations. The uncontradicted evidence demonstrates that PFI was aware of
12 Google's rights under § 10.4. In fact, around the time of the cessation of CNEX's business, CNEX
13 informed PFI that Google was exercising its ▮▮▮ under § 10.4 of the MPA. *See* Ex. 2.
14 *See also* Ex. 5 ("Google has the right to use all ▮▮▮ (including mask sets) to manufacture
15 ▮▮▮ for themselves, without paying future fees to CNEX") and Ex. 6. After a review of the
16 relevant agreements, PFI's own counsel agreed with this assessment. *See* Ex. 3. Notwithstanding
17 those clear rights, PFI — on its own — devised the argument that Google really exercised the
18 ▮▮▮ under the Amendment 2 instead of exercising its § 10.4 rights. *See* Ex. 4,
19 E. Koontz Dep., 31:24-33:22. PFI manufactured this argument in an attempt to convince the
20 Vendors to stop producing the ▮▮▮ Chip and to extract a substantial payment from Google to
21 keep the ▮▮▮ Project going.

      **b. PFI's Interference With Google's Contracts Was Unlawful and Without Justification.**

24 Because there is no legitimate dispute over PFI's interference with Google's contracts, the
25 question becomes whether PFI's interference was unlawful. "An action lies for interference by a
26 third person with a contractual relationship either by unlawful means or by means otherwise lawful
27 when there is a lack of sufficient justification for such interference." *Weiss v. Marcus*, 51 Cal. App.
28

1  3d 590, 600, 124 Cal. Rptr. 297, 302 (2nd Dist. Div. 4 1975). "[I]t is not necessary that the
2  defendant's conduct be wrongful apart from the interference with the contract itself." *Quelimane*
3  *Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 55, 77 Cal. Rptr. 2d 709, 960 P. 2d 513 (1998).
4      PFI's actions were unlawful because it contacted the Vendors for the express purpose of
5  attempting to coerce them to stop production of the ▮▮▮▮ Chips and extracting a $50 million
6  payment from Google to sell Google the rights that Google already paid for. *See* ECF 3, Ex. 18, p.
7  2. Despite being told that Google exercised its rights to obtain the release of the ▮▮▮▮
8  ▮▮▮▮ from ▮▮▮▮ under § 10.4 and not the ▮▮▮▮ (*see e.g.*
9  Ex. 2, 3, 5, and 6), on June 24, 2024, PFI stated to Google that it believed it had exercised the
10 ▮▮▮▮. *See* ECF 3, Ex. 11. In response, Google stated that it "has not and has no
11 plans to exercise the ▮▮▮▮ Rights." ECF 3, Ex. 13. Notwithstanding these facts,
12 on August 23, 2024, PFI sent separate emails to each of the Vendors, informing them "the
13 continued use of any equipment or software belonging to CNEX . . . is a violation of PFI's rights
14 as a secured party and wrongful conversion of such property actionable under US law." ECF 3,
15 Ex. 14. Through counsel, Google again informed PFI of Google's rights under § 10.4. ECF 3.
16 PFI's response was to send another series of emails to the Vendors on October 3, 2024, reiterating
17 the same threats. *See* Ex. 7. After CNEX filed for bankruptcy, PFI sent additional emails to the
18 Vendors on January 13, 2025, reiterating the same threats. *See* ECF 3, Ex. 15. PFI intended these
19 efforts to put Google's ▮▮▮▮ Project at risk and extort money from Google. At a very minimum,
20 PFI's actions lack sufficient legal justification.

21                    c.  **PFI Was Aware of Google's Contractual Relationships With**
22                        **CNEX and the Vendors.**

23     PFI argues that Google cannot establish that PFI knew of Google's contracts, and,
24 therefore, Google does not have a reasonable likelihood of prevailing on the merits of its tortious
25 interference with contract claim. That argument is without factual support.
26     PFI knew that the Vendors were manufacturing the ▮▮▮▮ Chip for Google. *See e.g.* Ex.
27 8. PFI's awareness of those contractual relationships is plainly evidenced by PFI's emails to the
28

1  Vendors in August 2024, October 2024, and January 2025, threatening them with lawsuits to
2  coerce them to stop manufacturing the ▮▮▮▮ Chip for Google. In those emails, PFI states that it
3  is aware the Vendors have used and made available CNEX equipment to Google. *See* ECF 3, Ex.
4  14. PFI further demanded the Vendors provide a log and an accounting of how the Vendors are
5  using the equipment for Google. *See* ECF 3, Ex. 14 and Ex. 15. From these facts this Court can
6  infer that PFI knew of the contracts. *A&I Transp., Inc. v. KG Admin. Servs.*, No. 8:19-cv-01992-
7  5B (ADSx), 2021 U.S. Dist. LEXIS 62910, at *10 (C.D. Cal. Jan. 7, 2021) (knowledge of contract
8  can be inferred).

9      PFI's Supplemental Response also conveniently disregards the other contract that Google
10  alleges PFI interfered with, the MPA. *See* ECF 1, ¶ 111 ("Google has existing contracts with
11  CNEX and the Vendors."); ECF 1, ¶ 118 ("PFI is aware of the license and access rights to the
12  Customized Software and Tooling that Google obtained from CNEX under the MPA and SOWs.").
13  PFI was aware that Google had the right under the MPA to continue the manufacture of the
14  ▮▮▮▮ Chips, yet attempted to coerce the Vendors from doing so, thereby, interfering with
15  Google's rights under the MPA.

16      **B.**    **Google's IP is Protected by Express Provisions in the MPA and Cannot Be**
17            **Disclosed or Assigned to Any Third Party.**

18      At its most basic level, PFI's opposition to Google's trade secret claims is based on its
19  desire to sell the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to third parties, including Google's
20  competitors, to enable them to manufacture (or have manufactured) the ▮▮▮▮ Chip. PFI asserts
21  that it obtained this right as CNEX's secured creditor. PFI is incorrect in this assertion because (1)
22  the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ includes Google's confidential "Background IP;" (2)
23  CNEX's license to use Google's "Background IP" and "Developed IP" is non-transferable and
24  limited to CNEX's use in performing the Services and providing the Deliverables for Google; and
25  (3) the MPA is non-assignable by CNEX.

26      **1.**    **PFI Does Not Have Any Rights Under the MPA, Including License**
27            **Rights to Google's Background IP and Developed IP.**

28

1    In seeking to enrich itself, PFI disregards all aspects of the MPA. For example, Google's IP was provided to CNEX under a non-disclosure agreement (*see* ECF 3, Ex. 7) and the confidentiality provisions in the MPA (*id.*, Ex. 4, at § 11). Without notifying Google or seeking its permission, PFI has taken Google's "Confidential Information" from CNEX and stored it in cardboard boxes in the residential garage of the home of PFI's CEO, Michael O'Malley. ECF 61, Ex. A, Interrogatory Resp. No. 5; *see also* Ex. 4, E. Koontz Dep., 62:21-66:5. Irrespective of how this Court ultimately rules on Google's trade secrets, Google's confidential and proprietary information that it provided to CNEX currently sits in an unsecure location and PFI has no right to possess it. *See e.g.* Ex. 12-17; 19-20; 22 (documents labeled "Google Proprietary/Confidential").

PFI's assertion that its rights as a secured creditor gives it all of CNEX's property and contractual rights is incorrect. CNEX has neither the right nor the power to assign the MPA. Section 16.7 of the MPA states: "███████████████████████████████████████████ ███████████████████████████████" ECF 3, Ex. 4, § 16.7. Non-assignability clauses, such as this one, are routinely enforced by California courts. *E.g., San Francisco Newspaper Printing Co. v. Superior Court*, 170 Cal.App.438, 442-43, 216 Cal.Rprt. 462, 464 (6th Dist. 1985) (citations omitted). The MPA's non-assignment clause is clear and unambiguous, and neither CNEX nor PFI could have reasonably expected it to mean something other than what it says. 170 Cal. App. at 443; 216 Cal. Rptr. at 465. Where, as here, a non-assignability clause provides that any assignment of rights is void, not only does the party not have the right to assign, it also does not have the power to assign. *See Contrarian Funds, LLC v. Woodbridge Grp. of Cos., LLC (In re Woodbridge Grp. of Cos., LLC)*, 606 B.R. 201, 205-206 (D. Del. 2019).

Similar to the MPA's non-assignability clause, the ███ that Google provided to CNEX for Google's "███████" and "███████" is ███████. ECF 3, Ex. 4, Attachment C, § 5.1. Not surprisingly, a non-transferable license means what it says: it cannot be transferred or assigned to any third party. *E.g., Everex Sys. v. Cadtrak Corp. (In re CFLC, Inc.)*, 89 F.3d 673, 674-76 (9th Cir. 1996).

**C.     Google Has Produced Extensive and Detailed, Proprietary and Confidential Documents Reflecting the Transfer of its Intellectual Property to CNEX.**

"The test for a trade secret is whether the matter sought to be protected is information (1) that is valuable because it is unknown to others and (2) that the owner has attempted to keep secret." *DVD Copy Control Assn., Inc. v. Bunner*, 116 Cal.App.4th 241, 251 (2004). Google's trade secrets are comprised of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* ECF 3, Ex. 3. Google has never alleged that these concepts, which are known in the industry, are deemed a trade secret in and of themselves. It is the custom specifications of these features, developed by Google before and independent of the services provided by CNEX ("Background IP"), giving it a unique competitive advantage in the marketplace. *Id*., ¶¶ 17-31. These custom specifications also include requirements which ensure ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id*., ¶¶ 12-14.

Prior to engaging with CNEX, Google engineers designed the preliminary specifications that would be known as the ▮▮▮ Project. *See* Ex. 9 (▮▮▮▮, "▮▮▮▮▮"); Ex. 36, ¶ 4. Specifically, Google engineers designed novel "▮▮▮▮" ▮▮▮▮▮▮ through the ▮▮▮ Chip. *Id*., ¶ 5. The "▮▮▮▮" ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id*. Through dozens of meetings and discussions, CNEX was introduced to the ▮▮▮▮, and with Google's support, applied the "▮▮▮▮" ▮▮▮▮ to the ▮▮▮ Chip. *Id*., ¶ 6.

During the five years Google and CNEX worked collaboratively on the ▮▮▮ Project, Google transmitted its custom specifications to CNEX through multiple channels. *Id*., ¶ 7. The primary means of conveying these custom specifications was through a Google shared drive (the "Shared Drive"). *Id*., ¶ 8. *See also* Ex. 10, S. Desai Dep., 144:11-145:15. PFI's attempt to mischaracterize this testimony to imply Google "could not point to any particular ▮▮▮▮ ▮▮▮▮" is misleading. *See* ECF 66, p. 14.

1    Access to the Shared Drive was strictly guarded and only granted on a need-to-know basis
2 to those employees at Google who worked on the ▓▓▓▓ Project and those employees at CNEX
3 who required access to the custom requirements to ensure integration into the ▓▓▓▓ Chip. *Id*.,
4 ¶ 9. For example, Scott Furey, former Vice President of Engineering at CNEX was granted access.
5 Neither Mr. Armstrong nor Mr. Moore, former CEO's of CNEX, are authorized users to the Shared
6 Drive, which in part explains their lack of knowledge surrounding Google's IP. *Id*., ¶ 10.
7    Within the Shared Drive, and produced by Google in expedited discovery, are dozens of
8 custom specifications authored by Google and shared with CNEX for the implementation into the
9 Customized Software and Tooling. *Id*., ¶ 11. These custom specifications include Google's
10 Background IP.
11    A key feature of the ▓▓▓▓ Chip is the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. The Background IP for the custom specifications that provide this
13 protection, including ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, can be found at Ex. 11 ("▓▓▓▓▓▓
14 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"). Contained within the margin of this document are
15 discussions between Google and CNEX engineers in which Google explains the custom
16 specifications to CNEX and how those custom specifications should be implemented into the
17 design of the ▓▓▓▓ Chip. *Id*.
18    Another key feature of the ▓▓▓▓ Chip is its custom specifications for its ▓▓▓▓▓▓
19 technology. These custom specifications provided ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
20 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Chip. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
21 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓. The ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
23 ▓▓▓▓▓▓▓▓▓▓▓▓. *See e.g.* Ex. 12 ("▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓"); and Ex. 13
24 ("▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓").
25    Additionally, Google provided custom specifications for the ▓▓▓▓ Chip's ▓▓▓▓▓▓
26 ▓▓▓▓▓▓. The ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓ Chip ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
27 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
28

██████████████████████████████████████████████████████████████. *See e.g.* Ex. 14, 15, and 16 ("██████████████████████████").

Google also provided custom specifications for its █████████████████ at: Ex. 17 ("███████████████████████"); Ex. 18 ("████████████████████████████"); Ex. 19 ("████████████████████████████████████████"); Ex. 20 ("████████████████████████████"); Ex. 21 ("████████████████████████████████"); and Ex. 22 ("████████████████████████████").

It was Google's practice to label the custom specification documents as "**Google Propriety/Confidential.**" *See e.g.* Ex. 12-17; 19-20; 22. To further protect the confidentiality of Google's Background IP contained in the custom specifications, all material was shared under the protections of a non-disclosure agreement (*see* ECF 3, Ex. 7) and the confidentiality provisions in the MPA (*id.*, Ex. 4, at § 11).

CNEX's own documents confirm the integration of these design specifications into the ████ Chip. *See* Ex. 23, p. 17 (The URL under "████████████████████████" links to Ex. 16; the URL under "████████████████████████████████████" links to Ex. 19; the URL under "████████████████████████" links Ex. 21). Moreover, CNEX's former CEO, Bill Moore, testified he was aware that Google deployed the "████████████████████" of live migration "████████████████████████████████." Ex. 35, B. Moore Dep., 55:11-21.

In addition to the aforementioned documents, Google transmitted its custom specifications to CNEX through the identification of "bugs" located by Google within the programming provided by CNEX at incremental stages in the design process. *See* Ex 10, S. Desai Dep. 97:12-15. *See also* Ex. 36, ¶ 12. Google identified and addressed these bugs with CNEX through Google's custom issue-tracking platform called Buganizer. *Id.* Google has produced more than 600 Buganizer tickets related to the ██████ Project in discovery. This platform allowed Google to test run certain features and components of the ██████ Chip on its current platform to test for seamless integration of the custom requirements and to provide feedback to CNEX engineers about inconsistent performance and provide instructions for correcting that behavior. *See e.g.* Ex. 24

1  ("█████████████████████████████████████████

2  █████████████████████████████████████████

3  █████████████████████████████."); Ex. 25 (former

4  CNEX engineer identifying the █████████████████████); Ex 26,

5  (discussion between Google and CNEX engineers regarding █████████

6  █████████████████); Ex. 27 (Google offering █████████

7  █████████████████); Ex. 28 (Fei Sun (former engineer at

8  CNEX) discusses █████████████████████████████

9  █████████████████████████████████████████

10  █████)); Ex. 29 (█████████████████s); Ex. 30 (exchanging █████

11  █████████████████████████); Ex. 31 (addressing

12  █████████); and Ex. 32 (Google and CNEX engineers discussing █████

13  █████████████████).

14      Google provided limited access to certain tickets, such as those associated with █████

15  to those engineers at CNEX who were assigned to address the bugs identified and features

16  requested. *See* Ex. 36, ¶ 13. This would further explain Mr. Armstrong's and Mr. Moore's lack of

17  understanding of this process, as neither had any responsibility for engineering of the █████

18  Project at CNEX. *See* Ex. 1, A. Armstrong Dep. 58:12-18; Ex. 35, B. Moore Dep. 72:1-5.

19      In addition to the custom specification documents and Buganizer tickets, Google conveyed

20  its Background IP by providing test plans to CNEX. *See* Ex. 36, ¶ 14. These test plans describe

21  █████████████████████████ Chip █████████

22  █████████████████████████. *Id*. These test plans describe

23  █████████████ Chip █████████

24  █████████████████. *Id. See also e.g.* Ex. 33 and 34.

25      These custom specifications were at all times considered to be Google's "Background IP."

26  *See* ECF 3, Ex. 4, Attachment C, §1.1. ("'█████████████████████

27  █████████████████████████████████"). The

28

1  MPA specifically provides that "██████████████████████████████████████████

2  ████████████████████████████████████" ECF 3, Ex. 4, Attachment C, §4.1. By design

3  and definition, the Background IP is integrated into the Developed IP, and inextricably intertwined

4  therein. *See* Ex. 10, S. Desai Dep., 25:11-26:3; 28:19-29:1; 80:20-81:9.

5      The Background IP license granted by Google to CNEX is a non-transferable license,

6  which can be used only "████████████████████████████████████████████████

7  ██████████████████████████" to Google.  ECF 3, Ex. 4 (MPA), Attachment C, § 5.1.

    **D.**    **PFI's Efforts to Compel Google to Identify its Background IP in CNEX's Assets Is Not Supported by the Facts or the Law.**

    PFI has failed to provide any legal basis for its claim that it is Google's burden to identify its Background IP within the Customized Software and Tooling and ████████████████ ████████. Google provided its confidential and propriety information through its custom specifications to CNEX, which then integrated that Background IP into the Customized Software and Tooling and ████████████████████████████. Google was not at the time nor is it presently privy to the manner in which its Background IP was integrated by CNEX in the final product. However, Google affirmatively knows that its Background IP is contained therein because the functionality of the custom specifications is operating as required on its server network. *See* Ex. 10, S. Desai Dep., 78:23-81:9.

    Contrary to PFI's assertion, Ms. Desai at her deposition did not "admit that [Google] cannot identify a place that the Google IP is incorporated into the CNEX Custom Tooling and Hardware," but rather referred PFI to "someone more expert in the coding" to do just that. *See* Ex. 10, S. Desai Dep., 82:2-13. Ms. Deasi further testified that she was not even aware if it was possible given the manner in which Google's IP is integrated into the end product. *Id*. at 87:23-88:19.

    Simply put, Google has demonstrated the transmission of its confidential and proprietary information to CNEX and the integration of that information within the very assets PFI is attempting to sell. The specific identification of the location of the confidential and proprietary information within those assets is in the exclusive knowledge of CNEX engineers.

1   **E.    The Balance of the Equities Weighs Strongly in Google's Favor.**

2   In addition to the facts and law, the equities greatly weigh in favor of prohibiting PFI from
3   interfering with Google's manufacture of the ▇▇▇ Chip, which is necessary to help secure
4   Google's information and the information of its users. PFI is a two-person company, which
5   invested $10 million (approximately $2 million of which has been repaid) to acquire CNEX's
6   patents (unrelated to the issues in this case) and lease them back to CNEX for high monthly
7   payments. After CNEX defaulted, PFI added $21.65 million in penalties to CNEX's indebtedness
8   and now argues that it must be able to collect royalties from Google under the ▇▇▇
9   ▇▇▇ of Amendment 2 — even though CNEX itself never invoiced Google for those amounts
10  and acknowledged that Google never exercised the ▇▇▇▇▇▇ and instead proceeded
11  under § 10.4 upon the cessation of CNEX's business.

12   **F.    This Court should not require a larger bond for the preliminary injunction**
13   **requested by Google.**

14   PFI's argument for an increased bond is without any factual basis and is contrary to the
15  law previously cited to the Court on this issue. *See* ECF 32, pp. 10-11. Therefore, PFI's request
16  should be denied.

17   **III.   CONCLUSION**

18   For all the reasons stated herein, and those set forth in Google's prior briefing, Google
19  respectfully requests this Court grant its request for a preliminary injunction to prevent PFI's
20  continued interference with Google's contractual relationships and to prevent the threatened sale
21  of assets incorporating Google's intellectual property.

Dated: July 10, 2025

WHITE AND WILLIAMS LLP

By: */s/ Morgan S. Birch*
Thomas B. Fiddler
Morgan S. Birch
Yusuf T. Yilmaz

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
Dale R. Bish

*Attorneys for Plaintiff Google LLC*