1
2
3
4

<div align="center">

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

</div>

8

| | |
|---|---|
| GOOGLE LLC, | Case No.  5:25-cv-04033-BLF |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART GOOGLE LLC'S MOTION FOR A PRELIMINARY INJUNCTION** |
| POINT FINANCIAL, INC., | |
| Defendant. | [Re:  Dkt. Nos. 3, 62] |

14

Plaintiff Google LLC ("Google") filed this action and an accompanying Motion for Temporary Restraining Order and Preliminary Injunction on May 8, 2025.  Dkt. Nos. 1 ("Compl."), 3 ("Mot.").  Pursuant to the Court's Order Setting Briefing Schedule and Hearing on Motion for Temporary Restraining Order and Preliminary Injunction, Dkt. No. 11, Defendant Point Financial, Inc. ("PFI") filed a brief in response to Google's motion for a temporary restraining order, Dkt. No. 30 ("Resp."), and Google filed a reply brief, Dkt. No. 32 ("Reply").  Following a hearing on the motion for a temporary restraining order ("TRO") on May 19, 2025, Dkt. No. 35, the Court issued a TRO and set a briefing schedule and hearing date on the motion for a preliminary injunction, *see* Dkt. No. 39 ("TRO Order").

Now before the Court is Google's Motion for a Preliminary Injunction.  Google filed a Supplemental Brief in Support of a Preliminary Injunction, Dkt. No. 62 ("Suppl. Mot."), and PFI filed a Response to Application for Order to Show Cause, Dkt. No. 66 ("Suppl. Resp.").  Google filed a supplemental reply in support of the motion for a preliminary injunction.  Dkt. No. 79 ("Suppl. Reply").  The Court held a hearing on July 10, 2025, at which it extended the TRO by

<div style="writing-mode: vertical-rl">United States District Court
Northern District of California</div>

1  fourteen days.  Dkt. Nos. 75, 76.  At the conclusion of the preliminary injunction hearing, the

2  Court invited Google to submit proposed language for an injunction related to its tortious

3  interference with contract claim.  Google submitted its proposed injunction, Dkt. No. 88, and PFI

4  filed a short responsive brief in which it set out various requested edits to the injunction language,

5  Dkt. No. 89.

6      For the following reasons, the Court now GRANTS IN PART AND DENIES IN PART

7  Google's Motion for a Preliminary Injunction.

## I.    BACKGROUND

9      Google is a multinational technology company with billions of users, many of whom store

10  information on solid-state drives ("SSDs") in Google's data centers.  Mot., Ex. 3 ("Desai Decl.")

11  ¶¶ 3–4.  To protect the information stored on these drives, Google must periodically update its

12  security hardware, software, and protocols.  *Id.* ¶ 7.  These updates require significant investment

13  of financial resources and engineering time, *id.* ¶ 8, and also sometimes involve work by outside

14  companies, *id.* ¶ 9.

15      This case involves such an external partnership.  On August 2, 2016, Google entered into a

16  Master Purchase Agreement ("MPA") with a company called CNEX Labs, Inc. ("CNEX"), which

17  had been founded in 2013.  Mot., Ex. 2 ("Kelkar Decl.") ¶ 8; Mot., Ex. 4 ("MPA").  Pursuant to

18  that agreement, CNEX was to provide hardware and software ("Customized Software and

19  Tooling") to Google related to the manufacture of ████ chips ██████████████.  Kelkar

20  Decl. ¶¶ 9–11.  Three years later, in September of 2019, Google and CNEX entered into Statement

21  of Work No. 1171292 for the "████ Project," which would ████████████████

22  ██████████████████████████ "████████  *Id.* ¶¶ 13–14;

23  Mot., Ex. 5 ("SOW").  Thereafter, the SOW was amended multiple times.  *E.g.*, Mot., Ex. 6;

24  Resp., Exs. A, C, D, E.  CNEX and Google were also parties to a non-disclosure agreement, Mot.,

25  Ex. 7, in addition to confidentiality provisions set out in the MPA, *see* MPA § 11.

26      The ████ Project ████ chip needed to be compatible with Google's infrastructure,

27  so Google provided certain intellectual property to CNEX to assist in development of the product,

28  including "████████████████████████████," and "████████████

United States District Court
Northern District of California

1 ███████████████████████████████████████████████████████████████

2 ████████████████████" of the ████████ Chip.  Desai Decl. ¶¶ 11–14.  Google also communicated various

3 technological requirements for the ████████ chip, including "████████████████████████

4 ███████████████████████████████."  *Id.* ¶ 16; *see* Suppl. Reply, Exs. 9, 11–22.

5 Although Google shared this information for purposes of the project, the initial MPA between

6 Google and CNEX stated that "███████████████████████████████████████████████

7 ███████████████████████████████████████████████████████████."  MPA

8 § 11.3.

9      As CNEX commenced work on the Customized Software and Tooling, it regularly

10 reported back to Google on its progress.  Desai Decl. ¶¶ 32–33.  CNEX and Google also

11 collaborated engineering and test runs, *id.* ¶ 34, and both CNEX and Google communicated with

12 various vendors that helped to manufacture and test the ████████ chips, *see* Kelkar Decl. ¶¶ 21–27.

13 Specifically, ██████████████████████████████████████ ("████████") manufactured the

14 chips, *id.* ¶ 24, ██████████████████████████ ("████████") tests the chips manufactured by

15 ████████, *id.* ¶ 26, and ██████████████████████████ ("████████") assembles the

16 components of the ████████ chip manufactured by ████████, *id.* ¶ 27; *see also* Mot., Exs. 8, 9, 10.

17 Google entered directly into agreements with each of these vendors at various points in time, Mot.,

18 Exs. 8, 9, 10, though for purposes of the ████████ Project, CNEX received the chip orders from

19 Google and relayed them to the vendors for production and testing, Kelkar Decl. ¶ 22.

20      After several years of working together with Google on the Customized Software and

21 Tooling, CNEX ceased operations on April 12, 2024, notifying Google of its closure on April 15,

22 2024.  *Id.* ¶ 35.  Thereafter, Google sought to exercise a provision of the MPA stating that the

23 ████████████████████████████████ for the Customized Software and Tooling would be

24 released to Google from escrow, where a current version of it was held during the project

25 partnership, if CNEX went out of business.  *See* Mot., Ex. 16.  That provision states that CNEX

26 granted to Google

27 ███████████████████████████████████████████████████████████

28 ███████████████████████████████████████████████████████

3

███████████████████████████████████████████████████

███████

MPA § 10.4(C).  Accordingly, Google now asserts that "upon the cessation of CNEX's operations, Google received all license and access rights to continue the production of the ██████ Chips to ensure the completion of the ██████ Project."  Mot. at 8–9.

This dispute arose because, two months after CNEX ceased operations, Defendant in this proceeding contacted Google to assert that it had a security interest in all of CNEX's assets pursuant to a loan from PFI on which CNEX had defaulted.  Mot., Ex. 11; *see* Suppl. Resp., Ex. C ("PFI Security Agreement").  PFI asserted that such assets included the ██████ ██████████████████ and the Customized Software and Tooling used to manufacture the ██████ chips.  *See* Mot., Ex. 11.  In August 2024, PFI proceeded to contact Google's vendors for manufacturing and testing of the chips to instruct them to discontinue using the ██████ ██████████████████ and the Customized Software and Tooling to fulfill Google's orders, asserting that to do so would violate PFI's rights.  *See* Mot., Exs. 14, 15.  Google responded by meeting with its vendors to assure them that it had the right to use the information to continue to produce the chips.  Kelkar Decl. ¶¶ 37–42.  However, Google believes that PFI intends to continue to instruct "the Vendors that Google does not have the right to manufacture the ██████ Chip using the Customized Software and Tooling," and that PFI may attempt to sell the Customized Software and Tooling to Google's competitors.  Mot. at 10.

Since Google believes those actions are in contravention of its agreements with CNEX and the vendors, Google filed suit and sought a TRO and Preliminary Injunction to prevent PFI from taking either action.  Google asserts three causes of action: (1) a claim for tortious interference with contractual relationships; (2) a claim for violations of the federal Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*; and (3) a claim for violations of California's Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.*

## II.    LEGAL STANDARD

An injunction is a matter of equitable discretion and is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat.*

United States District Court
Northern District of California

1    *Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted).  A plaintiff seeking preliminary

2    injunctive relief must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to

3    suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in

4    his favor, and [4] that an injunction is in the public interest." *Id.* at 20.  "If a plaintiff can only

5    show that there are serious questions going to the merits—a lesser showing than likelihood of

6    success on the merits—then a preliminary injunction may still issue if the balance of hardships tips

7    sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild*

8    *Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal alterations and citations omitted).

9    ## III.    DISCUSSION

10   The Court previously issued a TRO with two components, one going to Google's tortious

11   interference claim and one going to Google's trade secret claims.  *See* TRO Order at 12–13.  With

12   the benefit of a more developed record, the Court has concluded that only the tortious interference

13   component of the injunction should remain in place.  The following discussion addresses in turn

14   each of the two components of the original TRO.

15   ### A. Tortious Interference with Contract

16   #### 1. Likelihood of Success on the Merits

17   The first *Winter* factor asks whether the Plaintiff is "likely to succeed on the merits" of his

18   claims.  *Winter*, 555 U.S. at 20.  On this factor, the Court adheres to its prior conclusion that

19   Google has shown a likelihood of success on the merits of its tortious interference claim.  *See*

20   TRO Order at 5–6.  A claim for tortious interference with contract requires: "(1) the existence of a

21   valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that

22   contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the

23   contractual relationship; (4) actual breach or disruption of the contractual relationship; and

24   (5) resulting damage." *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141 (2020).  Here,

25   Google's claim is based on contracts between Google and CNEX—namely, the MPA and the

26   SOW and its subsequent amendments—as well as contracts between Google and the

27   manufacturing and testing vendors.

28   Google focuses its Supplemental Brief in Support of a Preliminary Injunction on the

tortious interference claim and, specifically, on PFI's "argument that the ███████████
contained in Amendment 2 to the Statement of Work" altered the rights granted to Google in
Section 10.4 of the MPA.  Suppl. Mot. at 1.  The "█████████████████" was a new "Special
Term" added in Amendment 2 to Statement of Work No. 1171292 that permitted Google "███
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████." Resp., Ex. A ("Amendment 2") at 1.  However,
Google argues that "the plain language of Section 10.4 evinces the parties' intention to give
Google a "█████████████████████████████████████████
████████████████████████████████████████████" Suppl.
Mot. at 4–5.  Google further argues that Amendment 2 to the SOW is clear that it amends the
SOW and *not* the MPA, the latter of which continues to govern the SOW.  *Id.* at 5.  Moreover,
Google argues that the "subsequent conduct of Google and CNEX" is consistent with the
understanding that, upon CNEX's cessation of business, Google exercised its rights under Section
10.4 of the MPA and did *not* exercise the ███████████████. *Id.*  Given this interpretation of
the MPA and SOW, Google requests an injunction to prevent PFI from interfering with Google's
ability to operate under Section 10.4, including by attempting to interfere with Google's dealings
with the manufacturing and testing vendors.

In its supplemental response, PFI focuses its attention on the rule that "if two parties have
separate contracts with a third, each may resort to any legitimate means at his disposal to secure
performance of his contract even though the necessary result will be to cause a breach of the other
contract."  *Pankow Const. Co. v. Advance Mortg. Corp.*, 618 F.2d 611, 616 (9th Cir. 1980)
(quoting *Imperial Ice Co. v. Rossier*, 18 Cal. 2d 33, 37 (1941)).  PFI states that "if a defendant's
'conduct was lawful and undertaken to enforce its rights,' it cannot be held liable for intentional
interference with a contract even if it knew that such conduct might interrupt a third party's
contract."  Suppl. Resp. at 1 (quoting *Webber v. Inland Empire Invs.*, 74 Cal. App. 4th 884, 905
(1999)).  PFI argues that this exception applies to its conduct because (1) Google's license under
Section 10.4 is subordinate to PFI's perfected security interest, and (2) PFI believes that Section

United States District Court
Northern District of California

1   10.4 actually created an Article 9 security interested that is unperfected and subject to PFI's

2   security interest.  *Id.* at 3–7.  In the alternative, PFI argues that the license to Google is voidable

3   under the California Uniform Voidable Transactions Act, Cal. Civ. Code § 3439 *et seq.*  *Id.* at 8.

4   Finally, PFI questions whether Google can make the necessary showing on the tortious

5   interference test regarding the existence of contracts with the manufacturing and testing vendors

6   with which PFI might have interfered, and PFI also states that Google lacks evidence that PFI

7   actually knew of any such contracts if they did exist.  *Id.* at 9–10.

8        As a preliminary matter, the Court concludes that Google has submitted persuasive

9   evidence that its rights under Section 10.4 of the MPA were not altered by the Statement of Work

10  or its subsequent amendments, and that Google did not ever exercise the ███████████████.

11  Section 10.4 of the MPA states that CNEX granted to Google



16  MPA § 10.4(C).  On a plain reading, this MPA term appears to permit Google to continue to

17  produce the █████ Chips royalty-free in the event of CNEX's closure.  PFI's argument to the

18  contrary is based on its position that Amendment 2 to the SOW, which added the ██████████

19  ██████ provision, conflicts with—and takes precedence over—the MPA insofar as the MPA

20  grants a royalty-free license.  Resp. at 5–6, 11–12; *see* Suppl. Mot., Ex. A at 5–8.  However, this

21  position is untenable.

22        If "clear and explicit," "[t]he language of a contract is to govern its interpretation."  Cal.

23  Civ. Code § 1638.  Here, the language of Section 10.4 is clear and explicit—and the same is also

24  true of the interaction between Amendment 2 and Section 10.4.  That is, as Google points out, the

25  introductory paragraph of Amendment 2 to the SOW expressly states that Amendment 2 amends

26  the SOW and "is governed by the Master Purchase Agreement entered into by the parties."

27  Amendment 2 at 1.  Amendment 2 then goes on to "████████████████████████████

28  ████████████████████████" various items, including the new ████████████████ provisions.

United States District Court
Northern District of California

1    *Id.* Nowhere does Amendment 2 state that it replaces or alters MPA terms.

2        Nor is the Court persuaded by PFI's argument that there is a "conflict" between the SOW

3    and the MPA following Amendment 2, and that such a conflict should be resolved by giving the

4    SOW term precedence. *See* Resp. at 4. Rather, the ███████████ provisions appear to

5    contemplate a situation in which ██████████████████████████████████

6    ██████████████████████ Chip, while Section 10.4 appears to ███████████

7    ████████████████████. *Compare* Amendment 2 § 7.7.2 ("███████████

8    ████████████████████████████████████████████

9    ████████████████████████████████████████████

10   ████████████████"), *with* MPA § 10.4(B)–(C) ("███████████████

11   ████████████████████████████████████████" any

12   of several events, including "████████████████," and effective at the time of said event

13   occurrence, "████████████████████████████████████

14   ████████████████."). There is no necessary conflict in the operation of these two

15   provisions, each of which appears tailored to apply in specific and separate underlying factual

16   circumstances.

17       In other words, the Court does not find the interaction between the SOW and the MPA to

18   be ambiguous. To the extent that it was ambiguous, however, the subsequent conduct of the

19   parties to those contracts would eliminate any confusion. "The rule is well settled that where a

20   contract is ambiguous, the court may consider the subsequent conduct of the parties for the

21   purpose of discovering their intent in entering into a contract," since the "acts of the parties to a

22   contract afford one of the most reliable means of arriving at their intention." *W. Med. Enters., Inc.*

23   *v. Albers*, 166 Cal. App. 3d 383, 391 (Ct. App. 1985) (citing *Tanner v. Title Ins. & Trust Co.*, 20

24   Cal. 2d 814, 823 (1942), and *Commerical Discount Co. v. Cowen*, 18 Cal. 2d 610, 615 (1941)).

25   Most glaringly, Google has submitted emails demonstrating that CNEX *expressly told* PFI that

26   Google would be "going with the ████████ (10.4) in the MPA and not claiming exercise of

27

28

1  ██████████," Suppl. Mot., Ex. B at 1, and that "Google has the right to use all ████ IP[1]

2  (including mask sets) to manufacture ████ for themselves, without paying further fees to

3  CNEX," *id.*, Ex. D at 2.  PFI has submitted *no evidence* that CNEX *ever* believed that Google had

4  exercised the ████████████, or that CNEX had ever invoiced Google for royalties—

5  including in the Chapter 7 bankruptcy filings, where CNEX would presumably have listed royalty

6  payments due if it believed that the ███████████ provisions superseded Section 10.4.

7  The Court therefore concludes that Google has demonstrated a likelihood of success on the merits

8  in proving that Section 10.4 of the MPA gave Google a royalty-free license to independently

9  manufacture the ████ Chip in the event of CNEX's cessation, and that Amendment 2 to the

10  SOW did not alter that license.

11      The Court now turns to PFI's other arguments, which are meant to show that PFI cannot be

12  held liable for tortious interference because it was rightfully and lawfully enforcing its own

13  contract rights.  None of PFI's alternative arguments succeeds in establishing this point.

14      First, the Court rejects PFI's argument that Google's license is "subordinate to PFI's

15  perfected security interest."  Suppl. Resp. at 3.  PFI states that under the California Commercial

16  Code "[a] security interest . . . continues in collateral notwithstanding sale, lease, license,

17  exchange, or other disposition thereof unless the secured party authorized the disposition free of

18  the security interest."  Cal. Com. Code § 9315(a)(1).  Such license rights "may be extinguished in

19  a disposition of the collateral upon default."  Suppl. Resp. at 3 (quoting *N. Star IP Holdings, LLC*

20  *v. Icon Trade Servs., LLC*, 710 F. Supp. 3d 183, 200 (S.D.N.Y. 2024)).  Yet, as PFI acknowledges,

21  there is an exception to this general rule: "a licensee in ordinary course of business takes its rights

22  under a nonexclusive license free of a security interest in the general intangible created by the

23  licensor, even if the security interest is perfected and the licensee knows of its existence."  Cal.

24  Com. Code § 9321(b).

25      PFI tries to evade this exception by arguing that Google "is not a licensee in the ordinary

26  course of business."  Suppl. Resp. at 4.  The Court is unconvinced.  PFI's narrow view is that

27

28  _____
[1] "████ IP" was CNEX's code name for the ████ ASIC.  Suppl. Resp., Ex. J at 29:2–7.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  CNEX was only in the business of granting licenses "to *use* the products it supplied." *Id.* at 5

2  (emphasis added). But the very point of Section 10.4 appears to be to ensure that, in the event of

3  CNEX's insolvency, Google could continue to secure the very same ███████ Chips (and the same

4  licensed intellectual property used to manufacture them) that Google was receiving while CNEX

5  was in business. Indeed, PFI's arguments about the ████████████████—while misplaced—

6  arose because Amendment 2 to the SOW contemplates a situation in which Google would be

7  licensed to work directly with a second manufacturing source to produce the ███████ Chips using

8  manufacturing license rights to the Customized Software and Tooling that are ██████████

9  ████████████████████████████████████ via Section 10.4 of the MPA.

10  Finally, CNEX's own founder testified that the MPA with Google was "a pretty standard MPA"

11  and that the company had "similar MPAs with Dell, Apple, with Microsoft . . . all with very

12  similar language." Suppl. Reply, Ex. 1 ("Armstrong Dep. Tr.") at 24:3–13. The MPA was

13  negotiated in the ordinary course of business, and the license rights therein were granted at the

14  time the MPA was executed, even if certain terms required a triggering event to become effective.

15      Next, the Court concludes that Section 10.4 did not create a "security interest" for Google.

16  On this point, PFI argues that "[a] transfer of a property interest for remedial purposes . . . that is

17  triggered upon the occurrence of a default, and for which no new value is given, is a security

18  interest subject to Article 9 of the UCC." Suppl. Resp. at 6 (citing Cal. Com. Code § 1201(b)(35);

19  *id.* § 9109(a)(1); *id.* § 9202). PFI tries to say that Section 10.4 is a "remedial device" of this kind,

20  and accordingly created a security interest that is unperfected and subordinate to PFI's interest. *Id.*

21  at 7. Again, the Court is not persuaded. PFI is a stranger to the contract and has provided neither

22  on-point authority nor a factual basis for finding that the Parties' bargained-for contract terms

23  were intended to be remedial or to "secure payment or performance of an obligation." Cal. Com.

24  Code § 1201(b)(35).

25      Third, the license granted to Google under Section 10.4 of the MPA is not voidable under

26  the California Uniform Voidable Transactions Act. PFI cites Section 3439.05 of the Act, which

27  states that "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor whose

28  claim arose before the transfer was made or the obligation was incurred if the debtor made the

transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time." Cal. Civ. Code § 3439.05(a). PFI argues that Section 10.4 was not effective until April 12, 2024, a date subsequent to the date on which PFI obtained its security interest in CNEX. Suppl. Resp. at 8. Since the terms of Section 10.4 grant a license to Google that is "███████" and "███████," PFI argues that Google did not provide a reasonably equivalent value to CNEX and that therefore PFI is entitled to void the license grant to Google. *Id.* There are two problems with this argument. First, as it points out on Reply, Google had long been providing consideration for the contract terms negotiated between it and CNEX. Suppl. Reply at 5. Second, the obligation set out in Section 10.4 was "incurred" when the Parties to the MPA entered that contract—in 2016, well before PFI obtained its security interest in CNEX and also well before CNEX became insolvent. The fact that the license rights only became effective later does not alter the fact that the obligation to act under Section 10.4 in appropriate circumstances arose in 2016. Because its claim arose later, PFI cannot possibly have a right to void the license set out in Section 10.4.

Finally, Google has submitted competent evidence that it had direct contracts with the manufacturing and testing vendors, that PFI had knowledge of those contracts, and that PFI's conduct in attempting to interfere with the contracts has damaged Google. Although PFI tries to argue that "there is no evidence that PFI knew Google had a direct contract with any of the CNEX vendors," Suppl. Resp. at 10, Google's evidence establishes that PFI was expressly told on multiple occasions that Google was proceeding under Section 10.4, and that this provision gave Google the right to ███████████████████████████████████ ██████ Chip. *See* Suppl. Mot., Ex. B at 1 (email from CNEX executive to PFI stating that Google was "going with the ███████ (10.4) in the MPA and not claiming exercise of ██████ ██████"); *id.*, Ex. D at 2 (email from CNEX executive to PFI indicating that, in the event of CNEX's closure, "Google has the right to use all ██████ IP (including mask sets) to manufacture ██████ for themselves, without paying further fees to CNEX"). PFI's subsequent outreach to the vendors makes clear that PFI knew the vendors were producing and testing the chips for Google. *See* Mot., Exs. 14, 15 (emails from PFI to ██████, ██████, and ██████ noting that PFI "underst[ood]

United States District Court
Northern District of California

1    that" certain equipment "ha[d] been used and made available to Google" in connection with the

2    ███████ Project during the preceding months).  The implication of such conduct is that there was

3    some kind of contractual agreement between Google and each of the vendors under which those

4    parties were proceeding.  PFI's arguments to the contrary defy logic and are directly undermined

5    by PFI's correspondence seeking to induce the vendors to discontinue manufacturing and testing

6    the ███████ Chips for Google.  Finally, Google has submitted evidence that it has been damaged

7    by PFI's interference, since at least one vendor did temporarily cease work until Google ████████

8    ███████████████████████████████ to reassure the vendor of Google's rights to use the Customized

9    Software and Tooling.  *See* Kelkar Decl. ¶¶ 40–41.

10       In light of the above analysis, the Court concludes that Google has demonstrated a

11   likelihood of success on the merits of its tortious interference with contract claim.

12                        **2. Irreparable Harm**

13       The second *Winter* factor considers whether the movant "is likely to suffer irreparable

14   harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  PFI argues that Google cannot

15   show irreparable harm with regard to the tortious interference claim because all it involves is "a

16   money issue."  Suppl. Resp. at 10.  However, PFI's argument regarding irreparable harm is once

17   again predicated on its theory that the ███████████████ provisions govern the present

18   situation, as PFI states that "Google was obligated to pay a royalty in the event it had the ████████

19   Chips manufactured by a ███████████" and thus could simply pay the royalty and then receive

20   money damages later if it prevails in this litigation.  *Id.*  The Court has already rejected PFI's

21   ███████████ theory, so this argument against irreparable harm is simply not persuasive.

22       Moreover, the Court finds that Google would be irreparably harmed by an interruption in

23   its ability to produce the ███████ Chips as permitted under its contract with CNEX.  Although

24   Google continues to develop replacement ███████ technology, that replacement technology is not

25   yet ready for implementation.  *See* Suppl. Resp., Ex. E ("Kelkar Dep. Tr.") at 123:6–16.

26   Therefore, an inability to complete the ███████ Project and to utilize the ███████ Chips as

27   planned could affect Google's ████████████████, the ████████████ handled by Google, and

28   Google's competitive position, which in turn would cause reputational harms to Google.  *See*

United States District Court
Northern District of California

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.").  Google has demonstrated that it is likely to incur irreparable harm in the absence of an injunction.

### 3. Balance of Equities

The third *Winter* factor considers whether "the balance of equities tips" in the movant's favor.  *Winter*, 555 U.S. at 20.  On this factor, PFI argues that the balance of equities favors denial of the injunction because, from PFI's perspective, granting the injunction would permit Google to duck its obligation to pay a royalty to CNEX.  Suppl. Resp. at 11.  PFI emphasizes that "[b]arring an injunction, Google would simply have to pay a royalty for use of the subject property." *Id.*  But once again, this entire argument is based on the assumption that the Court would agree with PFI's theory that the ███████████ applies in the event that CNEX becomes insolvent.  Having considered the contracts and the subsequent conduct by CNEX and Google, the Court has rejected PFI's ████████ theory.  Accordingly, the equities do not favor forcing Google to pay a royalty for license rights that were granted to it royalty free.  Quite to the contrary, the equities favor preventing PFI from wrongfully interfering with Google's contracts.  *Cf. Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) (noting that the balance of hardships favors the movant when the injunction will simply prevent violations of law).

### 4. Public Interest

The final *Winter* factor considers whether an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  PFI argues that the public interest also favors denial of the injunction because "Google and CNEX should not be permitted to circumvent the rights of duly secured creditors by arranging to transfer all such rights upon CNEX's insolvency."  Suppl. Resp. at 12.  But, as evidenced by the foregoing discussion, PFI's framing is inaccurate.  Google and CNEX entered into the MPA well before PFI took its security interest in CNEX.  Section 10.4 was negotiated at that time, and Google gave consideration for the various contract provisions throughout the working relationship between Google and CNEX.  The license granted upon CNEX's insolvency was not given "in satisfaction of a pre-existing debt," and Google did not have a "security interest"

13

1    in CNEX that was subordinate to PFI's.  In short, Google's exercise of Section 10.4 of the MPA is

2    not an effort to "bootstrap [it]self into priority over" PFI.  *See United States v. Handy and*

3    *Harman*, 750 F.2d 777, 782 (9th Cir. 1984).  It is in the public interest to enforce contracts and

4    prevent unlawful interference with them, so the final *Winter* factor favors granting the injunction

5    as to Google's tortious interference claim.  *See Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072,

6    1078 (N.D. Cal. 2016) ("Similarly, the public interest is served when defendant is asked to do no

7    more than abide by trade laws and the obligations of contractual agreements . . . .").

8                                          * * *

9           All four *Winter* factors favor issuing Google's requested injunction preventing PFI from

10   interfering with Google's rights under the MPA and its contracts with the manufacturing and

11   testing vendors.  Therefore, the Court determines that that portion of the injunction shall remain in

12   place pending trial.

13          **B. Trade Secret Claims**

14          Google's second and third claims for relief are based on alleged violations of the Defend

15   Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*, and violations of California's Uniform Trade Secrets

16   Act, Cal. Civ. Code § 3426 *et seq.*  On these claims, the injunction sought pertains to PFI's

17   intention to sell the Customized Software and Tooling used to manufacture the ███ Chips.

18   The Court initially granted Google's request for a TRO enjoining PFI from selling those assets.

19   Now, however, the more developed record leads the Court to conclude that this portion of the

20   injunction should be lifted.

21          Specifically, the Court now finds that Google has failed to show a likelihood of success on

22   the merits of its state and federal trade secret claims.  Courts often analyze claims under the

23   federal Defend Trade Secrets Act and the California Uniform Trade Secrets Act together, because

24   "the elements are substantially similar."  *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d

25   653, 657 (9th Cir. 2020).  To succeed on a claim for misappropriation of trade secrets under either

26   act, a plaintiff must prove: "(1) that the plaintiff possessed a trade secret, (2) that the defendant

27   misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to

28   the plaintiff."  *Nat'l Specialty Pharmacy, LLC v. Padhye*, 734 F. Supp. 3d 922, 929 (N.D. Cal.

United States District Court
Northern District of California

1   2024) (quoting *InteliClear*, 978 F.3d at 657–58) (discussing DTSA); *CytoDyn of New Mexico, Inc.*

2   *v. Amerimmune Pharms., Inc.*, 160 Cal. App. 4th 288, 297 (2008) ("Under the UTSA, a prima

3   facie claim for misappropriation of trade secrets 'requires the plaintiff to demonstrate: (1) the

4   plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade

5   secret through improper means, and (3) the defendant's actions damaged the plaintiff.'").

6       On the first factor of the trade secret misappropriation test, Google argues that it provided

7   CNEX with custom specifications related to █████████████████████████████████

8   ███████████████████████████████████████████████████████████

9   ████████████████████████. Suppl. Reply at 10; *see id.*, Exs. 9, 11–22. These

10  custom specifications were provided to CNEX primarily through a shared drive that "was strictly

11  guarded" and to which access was "only granted on a need-to-know basis." Suppl. Reply at 11.

12  Google states that this is why former CNEX executives Alan Armstrong and William Moore

13  testified in deposition that they were unaware of any Google intellectual property identified as

14  "trade secrets": neither of them "had any responsibility for engineering of the ██████ Project at

15  CNEX." *Id.* at 13. The documents in the shared drive were labeled as "Google

16  Proprietary/Confidential," and the custom specification information was subject to the non-

17  disclosure agreements and confidentiality agreements between Google and CNEX. *Id.* at 12.

18      So far as this first factor is concerned, the Court concludes that Google has met its burden:

19  the Court finds that the custom specifications are likely trade secrets held by Google. The DTSA

20  defines "trade secret" as:

21          [A]ll forms and types of financial, business, scientific, technical, economic, or
            engineering information, including patterns, plans, compilations, program devices,

22          formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or
            codes, whether tangible or intangible, and whether or how stored, compiled, or

23          memorialized physically, electronically, graphically, photographically, or in writing if--

24              (A) the owner thereof has taken reasonable measures to keep such information
                secret; and

25              (B) the information derives independent economic value, actual or potential, from

26              not being generally known to, and not being readily ascertainable through proper
                means by, another person who can obtain economic value from the disclosure or

27              use of the information[.]

28  18 U.S.C. § 1839(3). The CUTSA defines "trade secret" as:

15

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> > (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
> >
> > (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d).  Google has submitted evidence sufficient to show a likelihood of success in proving that the custom specifications are "information" that Google takes reasonable steps to keep secret, and that the unique and custom nature of these specifications gives Google a competitive edge in the market.  *E.g.*, Suppl. Reply, Ex. 36 ("Mahony Decl.") ¶¶ 8–10 (explaining that Google conveyed custom specifications to CNEX through a Google shared drive and that "[a]ccess to the Shared Drive was strictly guarded," such that not even former CNEX CEOs Alan Armstrong or William Moore were authorized users of the drive).

The problem for Google is that it is not these custom specifications that PFI seeks to sell. Indeed, PFI does not appear to dispute that Google's custom specifications may be trade secrets. Rather, PFI's argument is that Google's trade secrets are not embedded in—or discernable from— the CNEX assets that PFI hopes to sell.  *See* Suppl. Resp. at 13–14.  PFI states that "Google has failed in its pleadings and in discovery to identify any trade secret by anything other than a name or short phrase," *id.* at 14, and, critically, that "there is no evidence that a purchaser could discern any Google trade secret from any of the CNEX property in the possession of PFI, which is comprised of the ▮▮▮▮ Chips, the mask sets, and software code," *id.* at 16.

The Court agrees.  PFI helpfully distinguished between three relevant components of the disputed intellectual property: the ▮▮▮▮ Chips themselves, the mask sets, and the underlying software code.  The Court considers the evidence submitted as to each facet in turn.  First, as to the mask sets, former CNEX CEO Alan Armstrong expressly testified that it would not be possible to determine the underlying code from a mask set.  Suppl. Resp., Ex. I at 52:19–24 ("Q.  Do you have any understanding as to whether someone in the field could take a mask and know what the code is?  A.  No, they could not.  Q.  You don't know either way?  A.  They could not.").  Google's representative did not contradict that statement, indicating only that she was not sure

16

1    whether it would be possible to discern the trade secrets from the mask sets.  *E.g.*, Suppl. Resp.,

2    Ex. H at 148:2–4 ("Q.  If I had a mask, could I determine what that ███████████ is?

3    A.  I don't know.").

4         The same is true of the ██████ Chips themselves.  In fact, both the MPA and the SOW

5    granted CNEX the right to ████████████ Chips ████████████, *see, e.g.*, SOW § 7.1 ("████████

6    ██████████████████████████████████████████████."), which Google

7    admits would not have been permitted if its trade secrets could be determined from the chips.

8    Suppl. Resp., Ex. H at 38:13–39:3.  At deposition, Google's representative again testified that she

9    was unsure whether any trade secrets could be discerned from the ██████ Chips, stating that she

10   was "guessing" when she suggested that "someone who has malicious intent c[ould] figure . . .

11   out" Google's trade secrets by reverse engineering the chips.  *Id.* at 89:10–25; *see also id.* at

12   151:15–21 ("Q.  ██████████ feature.  Okay.  So if I had the chip, a ██████ chip, a ████████

13   ██████ chip—again, not I, but somebody skilled, somebody with the best skills in the industry,

14   could they determine what this ██████████ feature is and how it works?  A.  I don't know.").

15   Even if the chips were, in theory, susceptible to reverse engineering, Google's representative

16   testified that it would be "very, very, very burdensome" to do so and that it *might* be impossible.

17   *Id.* at 89:2–20.  In contrast, former CNEX CEO William Moore testified that it would not be

18   practically feasible to do so.  Suppl. Resp., Ex. J at 63:7–25 ("The Witness: . . . So you're asking if

19   someone with sufficient technical expertise were handed out of nowhere a CNEX chip, could they

20   determine, you know, how [a feature] was implemented?  Q. . . .  Correct.  A.  In the most

21   theoretical of senses, maybe.  In practical reality, no.").

22        Finally, although it appears to be a closer question, Google's representative also did not

23   clearly testify that Google's trade secrets could be extracted through analysis of the code itself.

24   *E.g.*, Suppl. Resp., Ex. H at 148:2–4 ("Q.  If I had the source code, could I determine what that

25   ██████████████ is?  A.  I don't know."); *id.* at 151:25–152:18 ("Q.  If they had the CNEX

26   source code, could they determine [what the ██████████ feature is and how it works] . . . ?

27   A.  In the source code, they can see [a variable name in the code that identifies the feature]. . . .

28   Q.  [Would] a name in the code, would that give them enough information to recreate [the

United States District Court
Northern District of California

1    feature]?  A.  It could, but I don't know."); *but see* Suppl. Reply, Ex. 10 at 82:2–13 (testimony of

2    Google's representative referring PFI's attorney to "someone more expert in the coding" to

3    identify the location of Google IP in the Customized Software and Tooling).

4         Google has known for approximately a year that PFI hoped to take possession and dispose

5    of CNEX's assets, including the Customized Software and Tooling.  *See* Mot., Ex. 11 (letter to

6    Google from PFI President Michael O'Malley dated June 24, 2024 stating that PFI had "a security

7    interest in all CNEX's assets"); *id.*, Ex. 18 (letter to Google's outside counsel from PFI President

8    dated October 15, 2024 opining that "[w]ere PFI to sell CNEX's intellectual property in a private

9    sale to one of Google's competitors in ██████████ . . . that competitor would have the legal

10   right to block Google's use or further development of any part of the CNEX IP").  That it has had

11   such significant amount of time to pinpoint its trade secrets in those assets—or, at the very least, to

12   confirm whether the trade secrets might be discernable to a purchaser—and still cannot

13   unequivocally say that its trade secrets are at risk in this regard renders the Court skeptical of

14   Google's trade secret claims.  The Court is concerned, for example, that Google has apparently not

15   even attempted to "analyze[] the CNEX code to determine whether it actually contains lines of

16   code or comments that disclose Google's trade secrets."  Suppl. Reply, Ex. 10 at 78:9–21.  The

17   nail in the coffin, so to speak, is the fact that Google's contracts with CNEX have long permitted

18   CNEX ████████████ Chip ███████████.  SOW § 7.1 ("████████████████████

19   ███████████████████████████████████████████████████████████████

20   ████████████████████").  By Google's own admission, it "would have objected" to CNEX

21   ████████████ Chips ██████████ "[i]f there were trade secrets" in the chips.  Suppl.

22   Resp., Ex. H at 38:13–39:3.  The fact that Google permitted a contract term allowing CNEX ████

23   ███ chips to ██████████ thus suggests that Google itself did not believe its trade secrets would be

24   discernable from the chips.

25        Nor has Google established that it *owns* the various components of the Customized

26   Software and Tooling outright in the wake of CNEX's closure.  Under 17 U.S.C. § 201,

27   "[c]opyright in a work . . . vests initially in the author or authors of the work" except where the

28   work was made for hire, in which case the author is considered to be the "employer or other

United States District Court
Northern District of California

United States District Court
Northern District of California

person for whom the work was prepared . . . unless the parties have expressly agreed otherwise in a written instrument signed by them."  17 U.S.C. § 201(a)–(b).  PFI has submitted evidence—which Google does not directly dispute—that the Customized Software and Tooling was created by CNEX, albeit according to Google's specifications and with Google's input throughout the project.  Suppl. Resp., Ex. I at 12:8–11; *id.*, Ex. J at 29:8–30:5.  Thus, the ██████ Project appears to fall under Section 201(b), and the question is whether the Parties came to any specific agreement, committed to writing, regarding which company would have ownership over the project deliverables.

Pursuant to the MPA and SOW, "████████████████████████" unless otherwise specified in an applicable SOW.  MPA, attach. C § 4.3(B).  ████████ is defined under the MPA as "███████████████████████████████████████████████████████████████████████████████████████████████.'"  *Id.* § 1.2.  Critically, though, neither the SOW nor any of the amendments identify anything as "█████████."  Instead, the SOW defines CNEX's "█████████" relevant to the ████ Project as

████████████████████████████████████
████████████████████████████
██████████████████████████████
██████████████████████
███████████████████████████████
████████████████
██████████████████████████████
██████████████

SOW § 6.2(B).  Meanwhile, Section 3.1(A) of the SOW describes the ██████████ for the project as "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████" Section 3.1(B) of the SOW defines the █████████████████████████████████████████████████████████ Google.  Under the ████████████████ █████ section of the SOW, the Parties go on to agree that CNEX █████████████████████, including "███████████████████████████████████████████████████████████████████████████████████

United States District Court
Northern District of California

1  ████.” SOW § 7.2(A).  Taking these various provisions in context to one another, the Court

2  finds that Google and CNEX agreed that the foregoing portions of the Customized Software and

3  Tooling would be ████████, while Google would own "████████

4  ████████████████████████

5  ████████████████████

6  ████.” SOW § 7.2(B).  Since the ████ ████, and ████████ are not

7  discernable from the chips, the mask sets, or the code—and since Google's portion of the

8  ████ was loaded only after the chips were delivered to Google from CNEX, *see* Suppl. Resp.,

9  Ex. H at 23:1–13—it appears that there is no barrier to PFI selling CNEX's portion of the

10 Customized Software and Tooling.

11       As a final note:  In its Supplemental Reply, Google emphasizes that the MPA contains a

12 "████████" clause stating that CNEX "████████████

13 ████████████████." Suppl. Reply at 9 (citing MPA § 16.7).

14 In addition, Google argues that the ████ to Google's ████ and ████ granted to

15 CNEX are ████████ under the MPA.  *Id.* (citing MPA, attach. C § 5.1).  Neither of these

16 points, however, go to Google's trade secret claims.  Insofar as CNEX had a ████ and

17 contractual rights granted by Google to ██ the ████ Chips ████, doing so clearly

18 would not misappropriate any trade secrets.  Whether PFI's efforts to ██ the same assets is

19 permissible may raise a separate issue of law—i.e., copyright infringement—but the Court fails to

20 see why the ████████ and ████████ clauses would support Google's trade secret

21 claims.

22       In light of the foregoing, the Court concludes that Google has *not* met its burden to show a

23 likelihood of success on the merits of its trade secret claims.  Although Google has identified trade

24 secrets that it owns, it has not shown that PFI's sale of the Customized Software and Tooling

25 would likely disclose or otherwise misappropriate those trade secrets.  Of course, to the extent that

26 any of Google's custom specification documents were downloaded locally onto physical CNEX

27 assets now in PFI's possession, PFI would likely be liable for trade secret misappropriation if it

28 accessed or sold those custom specification documents.  But it seems that PFI's intention is not to

United States District Court
Northern District of California

1    sell Google's custom specification information.  And as to the ███████ Chips, the mask sets, and

2    the code developed by CNEX, Google's evidence falls short of showing a likelihood of success in

3    establishing that its trade secrets would be disclosed through a sale.

4        Because likelihood of success on the merits "is a threshold inquiry and is the most

5    important factor" in the preliminary injunction analysis, "a 'court need not consider the other

6    factors' if a movant fails" to carry his burden on the first *Winter* factor.  *Baird v. Bonta*, 81 F.4th

7    1036, 1040 (9th Cir. 2023) (quoting *Env't Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir.

8    2020), and *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017)).

9    Accordingly, the Court will not proceed to consider the remaining three *Winter* factors for the

10   portion of the injunction related to Google's trade secret claims.  Instead, the Court determines

11   that the injunction preventing PFI from selling the Customized Software and Tooling must be

12   lifted.  As discussed at the hearing, however, any sale of such assets may not violate the injunction

13   the Court has issued related to Google's tortious interference claim.  Thus, for example, if PFI

14   sells the mask sets, the sale would need to be subject to terms ensuring Google's continued

15   "████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████████."

17   *See* MPA § 10.4(D).

18       **C. Security**

19       Under Federal Rule of Civil Procedure 65, "[t]he court may issue a preliminary injunction

20   or a temporary restraining order only if the movant gives security in an amount that the court

21   considers proper to pay the costs and damages sustained by any party found to have been

22   wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  District courts are invested "with

23   discretion as to the amount of security required, if any."  *Jorgensen v. Cassiday*, 320 F.3d 906,

24   919 (9th Cir. 2003) (quoting *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999)).

25       At the time of issuance of the TRO, the Court required Google to give security in the

26   amount of $250,000.00.  TRO Order at 12.  PFI requests that, in the event a preliminary injunction

27   issues, the Court increase the security imposed on Google.  With regard to the tortious

28   interference-related injunction in particular, PFI says that security should be set at the value of the

1    royalties that PFI will not receive from Google over the next two years, which PFI calculates to be

2    approximately $17,600,000.00.  Suppl. Resp. at 19.  Google responds that PFI's request for

3    increased security is at odds with the governing law regarding setting of security.  Suppl. Reply at

4    15.

5          In the absence of "a showing that some harm is more likely absent the posting of a security

6    bond," district courts have discretion to dispense with the security requirement.  *Jorgensen*, 320

7    F.3d at 919.  Here, the Court concludes that the previous bond of $250,000.00 is sufficient.  In

8    light of Google's evidentiary showing at the preliminary injunction stage, the Court does not find

9    a significant likelihood of harm to PFI from enjoining its interference with Google's contracts.

10   And even if PFI were ultimately to prevail, the Court is not overly concerned about PFI's ability to

11   collect any damages from Google.  Accordingly, the Court declines to increase security.

12   **IV.    ORDER**

13         For the foregoing reasons, the Court hereby ORDERS that Google LLC's Motion for a

14   Preliminary Injunction is GRANTED IN PART, as to Google's request for an injunction to

15   prevent wrongful interference with its contracts, AND DENIED IN PART, as to Google's request

16   for an injunction to prevent the disclosure of its alleged trade secrets.

17         PFI and any persons in active concert or participation with PFI, are hereby ENJOINED and

18   ORDERED as follows[2]:

19         1.    PFI is ENJOINED from taking any action intended to or having the effect of

20   interfering with Google's license and access rights granted under Section 10.4(C) and 10.4(D) of

21   the Master Purchase Agreement executed on August 2, 2016 between Google LLC and CNEX

22   Labs, Inc., including contacting any third-party with which Google has a relationship related to

23   the development, manufacture, production, and/or testing of the ▮▮▮▮ Project (defined at Dkt.

24

25

26   ---

[2] The Court has considered and adopted where relevant a number of the edits to Google's

27   proposed injunction language requested by PFI.  However, PFI requested affirmative relief that
     was not briefed, argued, or properly before the Court on a motion for preliminary injunction

28   brought by Google—namely, that Google be effectively enjoined from modifying the physical
     assets at issue in this lawsuit.  *See* Dkt. No. 89 at 2.  The Court declines to address this request.

United States District Court
Northern District of California

No. 3, p. 2:18–3:7) for the purpose of taking any action intended to or having the effect of interfering with that relationship; and

        2.      PFI is further ENJOINED from contacting any third-party, including but not limited to ███████████████████████████ ("██████"), ████████ ███████████████ ("██████"), and ████████████████████████ ("█████") (collectively, the "Vendors"), for the purpose of taking any action intended to or having the effect of interfering with Google's license and access rights to the "Customized Software and Tooling" (defined at Dkt. No. 3, p. 2:8–17), which includes but is not limited to all ████████ ████████████ photo mask sets, ██████████████████████ ████████████████████████████ used to manufacture and test the ███████ Chips under Sections 10.4(C) and 10.4(D) of the MPA.

This injunction SHALL remain in effect until the conclusion of this case or until modified by the Court, whichever is earlier.

Finally, Google SHALL post bond in the amount of $250,000.00. The Court will allow the bond that was posted upon issuance of the TRO to apply to satisfy the security requirement accompanying issuance of the preliminary injunction.

**IT IS SO ORDERED.**

Dated: July 24, 2025

_____
BETH LABSON FREEMAN
United States District Judge