United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

GOOGLE LLC,
Plaintiff,
v.
POINT FINANCIAL, INC.,
Defendant.

Case No. 25-cv-04033-BLF

**ORDER GRANTING IN PART AND DENYING IN PART GOOGLE LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND GRANTING IN PART AND DENYING IN PART POINT FINANCIAL, INC.'S MOTION FOR SUMMARY JUDGMENT**

[Re: ECF Nos. 250, 251]

Before the Court are two motions: Plaintiff Google LLC's ("Google") motion for partial summary judgment, ECF No. 251-1 ("Pl. Mot."), and Defendant Point Financial, Inc.'s ("PFI") motion for summary judgment, ECF No. 250 ("Def. Mot.").[1] Google filed a response to PFI's motion for summary judgment, ECF No. 253 ("Pl. Opp.") and a reply in support of its motion for partial summary judgment, ECF No. 264 ("Pl. Reply"). PFI filed a response to Google's motion for partial summary judgment, ECF No. 272 ("Def. Opp.") and a reply in support of its motion for summary judgment, ECF No. 282 ("Def. Reply"). The Court held a hearing on both motions on June 4, 2026. ECF No. 281. For the reasons stated by the Court on the record at the hearing and those set forth below, Google's motion is GRANTED IN PART AND DENIED IN PART and PFI's motion is GRANTED IN PART AND DENIED IN PART.

## I. BACKGROUND

### A. Undisputed Facts

#### 1. Google and CNEX's Collaboration

This case arises out of a collaboration between two technology companies: Plaintiff

[1] The Court will cite only the public versions of the documents in this Order.

Google and third-party CNEX Labs, Inc. ("CNEX").[2] Google is a multinational technology company that stores information on solid-state drives in data centers. Declaration of Smriti Desai, ECF No. 251-5, Ex. 11 ("Desai Decl.") ¶¶ 3–5. Information [redacted] is important to Google, which frequently updates its [redacted] hardware, software, and protocols. Desai Decl. ¶¶ 6–7. In connection with its goal of increasing information [redacted], Google engineers began designing a custom [redacted] chip (the "Chip") to fit with its existing infrastructure. Declaration of Mukul Kelkar, ECF No. 251-5, Ex. 10 ("Kelkar Decl.") ¶ 6. Google contracted with CNEX for this project. Kelkar Decl. ¶ 7. CNEX was a startup, formed in June 2013. Kelkar Decl. ¶ 28; *see also* ECF No. 253-2, Ex. 88 ("Armstrong Depo.") at 4:19–20. It was in the business of "deliver[ing] innovative system solutions in the form of semiconductors and software." ECF No. 253-2, Ex. 119 (CNEX website).

On August 2, 2016, Google and CNEX entered into a Master Purchase Agreement. Kelkar Decl. ¶ 8; *see also* ECF No. 251-5, Ex. 1 ("MPA"). Pursuant to the MPA, CNEX would provide Google with hardware and software (the "Customized Software and Tooling") for the manufacture of the Chips. Kelkar Decl. ¶ 9. The Customized Software and Tooling includes a photo-mask set ("mask set") that dictates how silicon in the Chip is manufactured. Kelkar Decl. ¶ 11.

CNEX and Google also agreed that any Customized Software and Tooling created under the MPA would be produced pursuant to a Statement of Work ("SOW"). MPA, attach. C § 2. After approximately three years of work and collaboration, on September 16, 2019, Google and CNEX entered into Statement of Work No. 1171292 for the "[redacted] Project." Kelkar Decl. ¶ 13; ECF No. 251-5, Ex. 2 ("SOW").[3] Among other things, the SOW provided that CNEX would "design, develop, and manufacture '[redacted],'" which is a custom integrated circuit device designed per specifications set forth in Exhibit A to the SOW. SOW § 2.1 & Ex. A. The SOW was amended multiple times. *E.g.*, ECF No. 251-5, Ex. 3 ("Amendment 1"), Ex. 4 ("Amendment 2"). Pursuant to the SOW and the amendments, Google paid CNEX roughly $[redacted]

---

[2] In its opposition to Google's motion, PFI identifies a list of disputed facts. Where these facts are relevant, they are identified below.

[3] CNEX assigned the codename "Raven" to the [redacted] project, and so the terms "[redacted]" and "Raven" are used interchangeably in the briefing and exhibits.

[redacted] for its services. Kelkar Decl. ¶ 17.

The [redacted] Project involved the development, design, and manufacture of the Chip, which enables Google to [redacted] data stored on drives and was designed to enhance [redacted] without disrupting Google's existing systems. Kelkar Decl. ¶¶ 18–19. As the Chip needed to be compatible with Google's standing infrastructure, Google provided CNEX with information about its technology. Desai Decl. ¶¶ 12–13. This information was protected under a non-disclosure agreement and confidentiality provisions in the MPA. Desai Decl. ¶ 13; *see also* MPA § 11 (confidentiality provisions); ECF No. 251-5, Ex. 8 ("NDA").

CNEX and Google co-developed the Customized Software and Tooling but CNEX did not manufacture the Chips itself. Kelkar Decl. ¶ 21. CNEX received production orders from Google and relayed those orders to vendors, who manufactured, tested, and assembled the Chips using the Customized Software and Tooling. Kelkar Decl. ¶ 22. As relevant here, Google had direct contracts with three vendors (the "Vendors"). Kelkar Decl. ¶ 23. On September 29, 2021, Google and [redacted] ("[redacted]") entered into the [redacted] Agreement for the manufacture of silicon chips, including the Chips at issue. Kelkar Decl. ¶ 24; *see also* ECF No. 251-5, Ex. 5 ([redacted] Agreement). On August 10, 2022, Google entered into the [redacted] Agreement with [redacted] ("[redacted]"). Kelkar Decl. ¶ 26; *see also* ECF No. 251-5, Ex. 6 ([redacted] Agreement). [redacted] was to test the Chips manufactured by [redacted]. Kelkar Decl. ¶ 26. Finally, on May 24, 2024, Google entered into a [redacted] Agreement with [redacted] ("[redacted]"). Kelkar Decl. ¶ 27 *see also* ECF No. 251-5, Ex. 7 ([redacted] Agreement). [redacted]'s role was to assemble the components of the Chip manufactured by [redacted]. Kelkar Decl. ¶ 27.

At the initial contracting stage, the parties expressly addressed a situation in which CNEX ceased to operate. Section 10.4(B) of the MPA provides that the Product and Manufacturing Information[4] and updates would be placed in escrow and later released from escrow and delivered

[4] The Product and Manufacturing Information includes "[redacted]" the Customized Software and Tooling and the

to Google if, among other things, CNEX "ceases to conduct business." MPA § 10.4(B)(3). In such an event, CNEX granted to Google:

[redacted]

MPA § 10.4(C). CNEX also agreed upon the cessation of its business that:

[redacted]

MPA § 10.4(D).

#### 2. CNEX Closes Its Doors

On April 12, 2024, CNEX closed its doors. *See* ECF No. 251-5, Ex. 52 (email from CNEX to Google and [redacted]). It notified Google and the Vendors three days later, on April 15, 2024. *Id.*; ECF No. 251-5, Ex. 53 (email to [redacted]), Ex. 54 (email to [redacted]). Google then requested and obtained the Product and Manufacturing Information from escrow. ECF No. 253-2, Ex. 86; *see also* MPA § 10.4(B). On December 11, 2024, CNEX filed for Chapter 7 Bankruptcy in the Northern District of California. *See In re CNEX Labs, Inc.*, Case No. 24-51889-SLJ (Bankr. N.D. Cal.).

### B. History of the Dispute

#### 1. PFI and Google

Defendant PFI is secured creditor of CNEX with a security interest that was perfected in 2021. *See* ECF No. 250-1, Ex. Y ("Security Agreement"). PFI takes the position that its perfected security interest gives it rights in CNEX's collateral that are superior to Google's rights under the

---

Services provided by CNEX under the MPA, SOW, Product Specific Terms or Purchase Orders. MPA §§ 1.15, 1.18. The Product and Manufacturing Information is the blueprint for the production of the [redacted] Chips using the Customized Software and Tooling. Under Section 10.4(A) of the MPA, CNEX delivered its Product and Manufacturing Information and subsequent updates to the agreed-upon escrow agent. MPA § 10.4(A).



United States District Court
Northern District of California

United States District Court
Northern District of California

MPA. For its part, Google believes Section 10.4 was triggered when CNEX ceased operations, and it further believes that the MPA unambiguously gives Google perpetual, royalty-free license and access rights to the technology, hardware, and tooling necessary to manufacture the Chip.

The parties' divergent understandings of the nature of their rights is the source of this dispute. On June 24, 2024, PFI sent Google a letter explaining that PFI was exercising "its rights under its security interest to collect directly on all accounts and general intangible obligations at any time payable to CNEX." ECF No. 251-5, Ex. 56. PFI further expressed its "understanding that Google ha[d] opted to exercise its [redacted] Rights" under the MPA, namely Google's right to [redacted] under SOW Amendment 2. *Id.*; *see also* Amendment 2 §§ 8, 10. On July 1, 2024, Google responded, stating that "Google ha[d] not, and ha[d] no plans to, exercise the [redacted] Rights." ECF No. 251-5, Ex. 57.

Following this exchange, in August 2024, PFI emailed the Vendors, asserting its rights to CNEX's equipment and software. ECF No. 251-5, Ex. 62 ([redacted]), Ex. 63 ([redacted]), Ex. 64 ([redacted]). PFI wrote that it "intend[ed] to assert and enforce its rights in CNEX assets to the full extent of the law." ECF No. 251-5, Ex. 62 ([redacted]), Ex. 63 ([redacted]), Ex. 64 ([redacted]). PFI emailed the Vendors again on October 3, 2024, including to "confirm receipt" of the previous message. ECF No. 251-5, Ex. 66 ([redacted]), Ex. 67 ([redacted]), Ex. 68 ([redacted]). On October 15, 2024, PFI sent a letter to Google, offering "to sell to Google what it owns for a cash payment of $50 million," explaining that for "unfettered use of CNEX proprietary information, this is a fair price." ECF No. 251-5, Ex. 69. And on January 13, 2025, PFI wrote the Vendors a third time to "reiterate our position and our demand for an accounting of [the Vendors'] use of CNEX property." ECF No. 251-5, Ex. 71 ([redacted]), Ex. 72 ([redacted]), Ex. 73 ([redacted]).

After PFI sent the August 2024 round of emails, one of the Vendors, [redacted], informed Google that it would halt production of the Chips and not process any new orders. Kelkar Decl. ¶ 40; *see also* ECF No. 251-5, Ex. 12 ("[redacted] Decl.") ¶ 6 & Ex. D ("We've received legal instruction to hold off on processing . . . until the dispute raised by Point Financial Inc., a creditor of CNEX, is resolved."). In November 2024, [redacted] agreed to process orders for Google again

after Google [redacted]. [redacted] Decl. ¶ 9 & Ex. 9.

### 2. Bankruptcy Litigation

While this action has been litigated, the CNEX bankruptcy, which was filed on December 11, 2024, has proceeded in parallel. *See In re CNEX Labs, Inc.*, Case No. 24-51889-SLJ (Bankr. N.D. Cal.). On March 10, 2025, PFI filed a motion for relief from the automatic stay so it could exercise its rights with respect to CNEX's property, which was granted on May 8, 2025. ECF No. 251-5, Ex. 13 (motion), Ex. 14 (order). On December 5, 2025, PFI filed a motion to convert the CNEX bankruptcy matter from Chapter 7 to 11, including so that PFI could "stabilize the company, bring in additional funding, engage with Google on the basis of clearly defined legal rights, and administer the assets in a manner consistent with their technical and commercial complexity." ECF No. 251-5, Ex. 15 ("Motion to Convert") ¶ 52. PFI also asserted that it "expect[ed] to achieve early revenue" through "a combination of license sales and the commercialization of market ready" Chips. Motion to Convert ¶¶ 42–43. The motion to convert also requested that the bankruptcy court authorize PFI to take over the manufacturing relationship with [redacted]. Motion to Convert ¶ 39. The bankruptcy court denied PFI's motion to convert. ECF No. 251-5, Ex. 17. The bankruptcy court explained that in its motion, PFI had "failed to meet its burden" to show that "converting from Chapter 7 to Chapter 11 benefits all parties in interest and furthers the purposes of the Bankruptcy Code." ECF No. 251-5, Ex. 16 at 7:12–16. In particular, the bankruptcy court found that (1) PFI had not shown that CNEX would be able to repay its debt; (2) the case would "probably be reconverted immediately;" (3) the plan would likely not be confirmed because it was not proposed in good faith; and (4) there was "no way" to conclude on the record "that Creditors would ever benefit from this proposal." *Id.* at 8:5–12:10

On February 24, 2026, PFI sent a Notice of Public Auction of CNEX's assets. ECF No. 251-5, Ex. 55. PFI became the owner of CNEX's assets via public auction on March 19, 2026. ECF No. 272-1, Ex. SS.

### 3. Procedural History

Google filed this suit against PFI in May 2025, asserting claims for: (1) tortious interference with contractual relationships; (2) violations of the federal Defend Trade Secrets Act



United States District Court
Northern District of California

United States District Court
Northern District of California

("DTSA"), 18 U.S.C. § 1831 et seq.; and (3) violations of the California Uniform Trade Secrets Act ("CUTSA"), Cal. Civ. Code § 3426 et seq. *See* ECF No. 1 ("Compl.") ¶¶ 110–158. Google prayed for a temporary restraining order, preliminary injunction, and permanent injunction prohibiting PFI from selling the assets containing Google's IP, in addition to compensatory damages in excess of $75,000, punitive damages, interest, and costs. *Id.* ¶ 158.

The Court granted Google's motion for a preliminary injunction based on its tortious interference claim and enjoined PFI "from taking any action intended to or having the effect of interfering with Google's license and access rights" to the CNEX technology, including contacting any of Google's vendors "for the purpose of taking any action intended to or having the effect of interfering with that relationship[.]" ECF No. 109 ("PI Order") at 22–23. The Court denied Google's motion for a preliminary injunction based on its trade secret claims, finding that Google had not identified trade secrets that would be disclosed through PFI's potential sale of CNEX's assets. *See id*. at 16–21. PFI appealed the preliminary injunction, ECF No. 113, and the preliminary injunction order was affirmed by the Ninth Circuit on May 4, 2026, ECF No. 249. *See also Google LLC v. Point Financial, Inc.*, No. 25-5341, 2026 WL 1283924 (9th Cir. May 4, 2026).

PFI filed its answer and counterclaim on May 30, 2025, which was subsequently amended after the Court granted in part and denied in part PFI's motion for leave to amend the counterclaim. *See* ECF No. 208. In its operative pleading, PFI asserts claims for (1) unjust enrichment; (2) declaratory judgment – voidable transaction; (3) declaratory judgment – future royalites; and (4) open account. Answer and Amended Counterclaim, ECF No. 212 ("Counterclaim") ¶¶ 5–29. PFI seeks compensatory damages, interest, costs, and attorneys' fees. *Id.* at 16.

## II. LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is material if it might affect the outcome of the lawsuit, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* On an issue for which the nonmoving party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. If the evidence in opposition to the motion is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50.

Once the moving party has met its initial burden, the burden of production shifts to the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Id.* at 323.

The Court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence presented and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631. The nonmoving party has the burden of identifying with reasonable particularity the evidence that precludes summary judgment. *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996). If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. *Id.*

United States District Court
Northern District of California

## III. DISCUSSION

Google moves for summary judgment as to its claim for tortious interference with contractual relationships and as to each of PFI's counterclaims, namely unjust enrichment, declaratory judgment – future royalties, declaratory judgment – voidable transaction, and open account. PFI likewise moves for summary judgment as to Google's tortious interference claim and as to its counterclaims for unjust enrichment and open account. In addition, PFI contends that it is entitled to summary judgment as to Google's trade secret claims. Although not briefed as cross motions, the two motions before the Court have substantial overlap. Accordingly, the Court addresses each claim in turn.

### A. Cross Motions Re Tortious Interference with Contractual Relationships

Both parties move for summary judgment as to Google's claim for tortious interference with contractual relationships. In brief, Google alleges that PFI's emails to the Vendors interfered with Google's contracts and that Google sustained harm as a result. Compl. ¶¶ 110–28. At the preliminary injunction stage, the Court found that Google had demonstrated a likelihood of success on the merits of its tortious interference claim, PI Order at 12, and, after analyzing the remaining factors in the analysis, preliminarily enjoined PFI from taking any action intended to or having the effect of interfering with Google's license and access rights granted under Section 10.4(C) and 10.4(D) of the MPA, *id.* at 22–23. The Ninth Circuit affirmed. *Google*, 2026 WL 1283924, at *1–2. With the record now fully developed, both parties seek summary judgment as to this claim.

To prevail on its claim for tortious interference with contractual relationships, Google must present undisputed facts sufficient to establish: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1272 (N.D. Cal. 2022) (quoting *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1191 (9th Cir. 2022)).

United States District Court
Northern District of California

**1. Google's Motion for Summary Judgment**

The Court begins with Google's motion for summary judgment as to its tortious interference claim. Google contends that the undisputed facts establish each element of the claim. Pl. Mot. at 14–18. PFI takes the position that Google cannot meet its burden as to the intentional acts, actual breach or disruption, and damage elements. Def. Opp. at 19–20.

**a. Valid Contracts**

Google argues that it is undisputed that Google has contracts with CNEX and the Vendors. Pl. Mot. at 14. Google points to its MPA with CNEX. *See* ECF No. 251-5, Ex. 1 (MPA). Among other things, this contract provided Google with (1) "[redacted]" the Customized Software and Tooling used to manufacture the [redacted] Chip, MPA § 10.1; (2) "[redacted] [the Product and Manufacturing Information]" in the event CNEX ceased its operations, MPA § 10.4(C); and (3) "[redacted]" in the event CNEX ceased its operations, MPA § 10.4(D). Google also identifies its contracts with each of the Vendors for the manufacture, testing, and assembly of the Chip. *See* ECF No. 251-5, Ex. 5 ([redacted] Agreement with [redacted]), Ex. 6 ([redacted] Agreement with [redacted]), Ex. 7 ([redacted] Agreement with [redacted]). Because Google has identified contracts between Google and third parties and PFI does not contest this issue, the Court finds that Google has established the existence of valid contracts with third parties. *See hiQ*, 31 F.4th at 1191.

**b. Knowledge**

Google must also establish that PFI knew about the at-issue contracts and identifies evidence so demonstrating. *Id.* at 1191–92. For instance, Google offers testimony from PFI's COO, Eric Koontz, that CNEX's contracts with Google would have been provided at the time of PFI's underwriting (in 2021) and PFI was specifically aware of Section 10.4 of the MPA by mid-2023. *See* ECF No. 251-5, Ex. 24 ("Koontz Depo.") at 14:17–23, 17:16–18:3. To name another example, a June 20, 2023, email from CNEX's counsel to PFI executives explained that "the escrow provision in the MPA contemplates a release in the event of bankruptcy or related events

United States District Court
Northern District of California

and grants Google a royalty-free license to make and have made Product." ECF No. 251-5, Ex. 51.

Google separately points to evidence from the wake of CNEX's bankruptcy that shows PFI's specific knowledge of the relevant contractual provisions. One such illustration is an email from CNEX's former CEO, William "Bill" Moore, to PFI executives on March 27, 2024, explaining that "Google has the right to use all Raven IP (including mask sets) to manufacture Raven for themselves, without paying further fees to CNEX." ECF No. 251-5, Ex. 58; *see also* ECF No. 251-5, Ex. 60 (June 14, 2024, email from CNEX executive to PFI executives) ("Since you already had the MPA, I assume you are familiar with Section 10.4 covering the escrow and triggering events. This will likely be what Google is using to justify their position on taking over Raven A1 sourcing."). PFI's own counsel likewise advised PFI in June 2024 that Section 10.4 "specifically provides that if the software is released from escrow, Google has [the] irrevocable right to make derivative works solely to make the Product solely for Google's internal use." ECF No. 251-5, Ex. 49 at 4989.

Google also submits evidence demonstrating PFI's knowledge of Google's contractual relationships with the Vendors. For instance, as part of contractual negotiations in July 2023, PFI received an email from CNEX that mentioned that [redacted] and [redacted] manufactured the Chips. ECF No. 251-5, Ex. 75. During a call between PFI and CNEX executives on June 26, 2024, PFI asked CNEX to confirm the Vendors and provide PFI with their contact information. *See* ECF No. 251-5, Ex. 35, at 1:41:52–1:44:02. Two days later, CNEX's former VP of Engineering, Scott Furey, provided PFI executives with contact information for the Vendors involved in the production of the Chip. ECF No. 251–5, Ex. 41; *see also* ECF No. 251-5, Ex. 23 ("Furey Depo.") 122:15–19; 124:5–16 (explaining that PFI had asked him for, and he provided, contact information for the Vendors).

In sum, Google has submitted evidence establishing PFI's knowledge of the at-issue contracts and has accordingly met its moving burden. PFI also does not contest this issue. Thus, the Court finds that Google has established PFI's knowledge.

**c. Intentional Acts**

Google must also show that PFI's conduct "constitute[d] 'intentional acts designed to induce a breach or disruption' of [Google's] contractual relationships with third parties." *hiQ*, 31 F.4th at 1192 (quoting *Pac Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990)). Google contends that the undisputed evidence easily satisfies this element. Pl. Mot. at 16. Google identifies evidence showing that PFI's actions were intended to induce a breach or disruption of Google's contractual relationships with the Vendors. For example, on June 24, 2024, PFI wrote to Google asserting its security interest in all of CNEX's assets and demanding payment from Google under the [redacted] of Amendment 2 to the SOW. ECF No. 251-5, Ex. 56. The [redacted] is Google's right to [redacted]. *See* Amendment 2 § 1. A few days later, Google wrote PFI, in part to clarify that "Google ha[d] not, and ha[d] no plans to, exercise the [redacted] Rights," and explaining that CNEX and Google had been, and were continuing, to proceed under Section 10.4 of the MPA. ECF No. 251-5, Ex. 85 at 249.

Despite this clarification of Google's position, in August 2024, PFI emailed the Vendors, writing, "You are hereby notified that the continued use of any equipment or software belonging to CNEX, including without limitation the following described equipment, is a violation of PFI's rights as [a] secured party and wrongful conversion of such property [is] actionable under US Law . . . PFI intends to assert and enforce its rights in CNEX assets to the full extent of the law." ECF No. 251-5, Ex. 62 ([redacted]), Ex. 63 ([redacted]), Ex. 64 ([redacted]). On September 10, 2024, Google's counsel advised PFI's counsel of Google's license and access rights under the MPA and demanded that PFI cease its conduct and retract its false statements. ECF No. 251-5, Ex. 65. PFI's response was to email the Vendors again, in October 2024, stating that "we require you to confirm receipt of this message and to provide the requested log of equipment." ECF No. 251-5, Ex. 66 ([redacted]), Ex. 67 ([redacted]), Ex. 68 ([redacted]). In January 2025, PFI wrote the Vendors for a third time, "to reiterate our position and our demand for an accounting of your company's use of CNEX property." ECF No. 251-5, Ex. 71 ([redacted]), Ex. 72 ([redacted]), Ex. 73 ([redacted]). A reasonable

jury could draw only one inference from this evidence: that PFI intended to disrupt Google's contracts with the Vendors.

Aside from the communications themselves, Google identifies evidence demonstrating that PFI's purpose was to halt production of the Chips. For instance, PFI's CEO, Michael O'Malley, testified that the very purpose of sending the August 2024, October 2024, and January 2025 emails was to halt the production of the Chips by threatening the Vendors with lawsuits. ECF No. 251-5, Ex. 25 ("O'Malley Depo.") at 139:20–145:8 ("Q. Was that the approach to threaten to sue the vendors and also to tell them that they needed to stop production notwithstanding Section 10.4 rights belonging to Google . . . A. Essentially, yes.").

PFI does not directly dispute Google's evidence of interference with vendor contracts caused by PFI's intentional act of sending a series of emails to the Vendors with the goal of causing the Vendors to cease Chip production for Google. Instead, PFI argues that Google does not meet its burden as to the intentional acts element based on PFI's justification defense. PFI submits that its conduct is not actionable interference under the California Supreme Court's holding in *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 56 (1998), *as modified* (Sept. 23, 1998). Def. Opp. at 19. In *Quelimane*, the California Supreme Court explained:

> [i]f the actor is not acting criminally nor with fraud or violence or other means wrongful in themselves but is endeavoring to advance some interest of his own, the fact that he is aware that he will cause interference with the plaintiff's contract may be regarded as such a minor and incidental consequence and so far removed from the defendant's objective that as against the plaintiff the interference may be found to be not improper.

19 Cal. 4th at 56. According to PFI, this rule categorically bars tortious interference claims against creditors who are merely asserting their conflicting rights, even if breach of third party contracts is a consequence of such assertions. PFI's reliance on *Quelimane* is discussed in full below in section III.A.1.f.i(5). Indeed, whether PFI's conduct was justified because it was furthering its own business interests in good faith does not speak to the issue of whether Google has met its moving burden to establish PFI's intentional acts designed to induce breach or disruption. Accordingly, PFI's argument does not defeat Google's proof of its prima facie case.

The Court concludes that Google has identified evidence sufficient to show that PFI's

United States District Court
Northern District of California

conduct was intended to induce a disruption of Google's contractual relationships with the Vendors. PFI's justification defense bears directly on this element and is discussed below. *See supra* § III.A.1.f.i.

**d. Breach or Disruption**

Turning to the breach or disruption element of Google's tortious interference claim, Google must identify evidence sufficient to show that PFI's conduct actually caused a breach or disruption of the at-issue contracts. *See hiQ*, 31 F.4th at 1191–92. According to Google, the record establishes that PFI's intentional conduct led one vendor to cease production of the Chips and decline to take any new orders from Google. Pl. Mot. at 16–17. Indeed, in September 2024, one of the Vendors informed Google that it would halt production of the Chips based on the threats in PFI's email. Kelkar Decl. ¶ 40; *see also* [redacted] Decl. ¶ 6 & Ex. D. PFI's CEO also explained in an October 2024 call with a CNEX executive that the vendor "stopped manufacturing" after PFI told that vendor "to cease and desist" because "these are our assets and you'll be held, you know, liable if you continue to use them without our approval." ECF No. 251-5, Ex. 44 at 17:12–18:09. Although the vendor "never responded[,] Google sure did." *Id.* Finally, Google submits evidence that the vendor started manufacturing for Google again only after Google [redacted] the vendor [redacted] by PFI. *See* [redacted] Decl. ¶ 9 & Ex. G. The Court finds that Google has met its moving burden to identify undisputed facts in the record sufficient to establish an actual breach or disruption caused by PFI's conduct. The burden shifts to PFI to identify facts in dispute.

PFI responds that Google overstates its case, arguing that the evidence merely shows that the vendor "expressed concerns" and "delayed processing new purchase orders for, at most, about two weeks until Google [redacted] it." Def. Opp. at 19–20 (citing ECF No. 272-1, Exs. MM–OO). For example, PFI identifies a November 8, 2024, email from the vendor to Google confirming that it would proceed processing purchase orders after both parties had [redacted]. ECF No. 272-1, Ex. OO.

PFI's argument amounts to an acknowledgement that its conduct did, in fact, disrupt the at-issue contracts. Its contention that a vendor merely "expressed concerns" and "delayed processing

United States District Court
Northern District of California

new purchase orders" goes to the severity of the disruption, rather than the fact of the disruption. It is enough that Google has submitted evidence sufficient to demonstrate "interference which makes enjoyment of a contract more expensive or burdensome." *Pac. Gas & Elec. Co.*, 50 Cal. 3d at 1127. The Court concludes that PFI has not identified any facts in dispute as to this element of the tortious interference claim. Google has thus established that PFI's intentional acts disrupted Google's third-party contracts.

**e. Damage**

The final element of an intentional interference claim is damage. *See hiQ*, 31 F.4th at 1191. Google argues that there is evidence in the record demonstrating that it sustained damage because of PFI's threatening the Vendors. Pl. Mot. at 17–18. For example, after one vendor informed Google that it would halt production of the Chips due to PFI's threats, Google spent time and resources meeting with that vendor to provide assurances. Kelkar Mot. Decl. ¶ 41; *see also* [redacted] Decl. ¶¶ 6, 9 & Exs. D, G. The evidence also shows that only after Google [redacted] did the vendor resume manufacturing. *See* [redacted] Decl. ¶ 10 & Ex. H. Google also identifies evidence demonstrating that it expended time and resources researching the development of potential alternatives to the Chip in light of the disruption. Kelkar Decl. ¶ 42. The Court finds that Google has met its moving burden as to the damage element of its tortious interference claim, and the burden shifts to PFI to identify genuine issues for trial.

In response, PFI contends that there was no cognizable injury, including because Google was able to continue its relationship with the Vendors. For example, PFI points to testimony from Google's representative that PFI's letter to [redacted] has not interfered with Google's ability to develop the technology and collaborate with the vendor, as Google is "continuing to do the work." ECF No. 272-1, Ex. UU at 112:1–6. The Court finds that PFI has failed to identify any disputed issues of material fact as to *the fact* of damage to Google. PFI's argument again goes to the severity of the damage. Indeed, PFI does not identify any authority to support the proposition that delays in processing and an investment of time in mending a relationship with a third party does not give rise to cognizable harm. The Court thus finds that Google has established it was damaged by the disruption to its contractual relationships with third parties.

United States District Court
Northern District of California

* * *

In sum, the Court finds that Google has met its burden to establish a prima facie case of tortious interference with contractual relationships. PFI does not submit additional evidence creating a dispute of material fact in connection with any of the elements. Accordingly, the Court next considers whether PFI's affirmative defenses defeat this claim.

**f. PFI's Affirmative Defenses**

In opposition to Google's motion, PFI raises the affirmative defenses of justification and privilege. The Court considers each affirmative defense in turn.

**i. Justification**

PFI contends that it cannot be held liable for conduct that was "lawful and undertaken to enforce its rights," even if a consequence of the conduct would be disruption of a third-party's contract. Def. Opp. at 7–8 (quoting *Webber v. Inland Emp. Invs*., 74 Cal. App. 4th 884, 898 (1999)). "Under California law, a legitimate business purpose can indeed justify interference with contract." *hiQ*, 31 F.4th at 1192. However, "not just any such purpose suffices." *Id.* Indeed, "interference with an existing contract is not justified simply because a competitor seeks to further his own economic advantage at the expense of another." *Id.* (citation and internal quotation marks omitted). Instead, justification is "afforded to a party where (1) he has a legally protected interest, (2) in good faith threatens to protect it, and (3) the threat is to protect it by appropriate means." *Richardson v. La Rancherita*, 8 Cal. App. 3d 73, 81 (1979); *see also Quelimane*, 19 Cal. 4th at 56–57 (explaining that contractual interference may be justified where the defendant had a "legitimate business purpose"). Justification is an affirmative defense on which PFI bears the burden of proof. *hiQ*, 31 F.4th at 1192.

PFI raises two main arguments in connection with the issue of justification. First, PFI contends that it was justified because it was "lawfully enforcing its perfected security interest," because its rights are superior to Google's. Def. Opp. at 6. Arguing that its perfected security interest takes priority, PFI contends that (1) at best, Section 10.4 created a security interest that Google never perfected; (2) to the extent Google's rights are merely contractual, PFI's rights still take priority; and (3) CNEX's transfer to Google in April 2024 is voidable. Def. Opp. at 10–19.

United States District Court
Northern District of California

Second, PFI argues that it asserted its superior rights in good faith. *Id.* at 6, 19. The Court begins with PFI's arguments that its rights indeed take priority, and then turns to the issue of whether PFI asserted its rights in good faith.

**(1) Whether PFI's Rights Take Priority**

First, PFI argues that its conduct is privileged as a matter of California law because PFI was lawfully enforcing its perfected security interest. Def. Opp. at 7–8. As PFI explains, the argument that its conduct is categorically privileged because it was enforcing its superior rights "begs the only question that matters—whether Google's rights are in fact superior to PFI's." Def. Opp. at 8; *see also Richardson*, 98 Cal. App. 3d at 81 (explaining that justification is afforded to a party where it has a legally protected interest). Thus, the Court turns to consideration of PFI's contentions as to why its rights take priority.

**(2) Whether Section 10.4 Created a Security Interest**

PFI claims that it lawfully asserted its own superior rights to the CNEX assets based on its perfected security interest. And since Google only obtained a security interest under Section 10.4, which it failed to secure, PFI's rights take priority. Def. Opp. at 10–13. Google responds that the plain language of the MPA and its subsequent course of conduct with CNEX confirm that Section 10.4 was not intended to secure payment or performance of any obligation by CNEX. Pl. Opp. at 11–12. At the preliminary injunction stage, the Court found that there was no basis from which to find that Section 10.4 created a security interest. PI Order at 10. With the benefit of the fully developed record, the Court evaluates this issue anew.

PFI urges that Section 10.4 is a "textbook definition of a security interest" because it secured CNEX's obligation to supply the Chips to Google by granting Google a license to access CNEX's intellectual property and physical tooling and hardware without further compensation. Def. Mot. at 1–2. A security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation." Cal. Com. Code § 1201(b)(35). For an instrument to create a security interest, the parties must intend to create one. *In re CFLC, Inc.*, 166 F.3d 1012, 1016 (9th Cir. 1999). "Determining whether the parties intended to create a security interest is a two-step process. The court must find both language in a written agreement that objectively indicates the parties' intent to create a security interest and the presence of a subjective intent by

United States District Court
Northern District of California

the parties to create a security interest." *Id.*

PFI presents an issue of contract interpretation to be decided by the Court. Here, the plain language of the MPA demonstrates that Section 10.4 was not intended to create a security interest. Instead, it provided for a "[redacted]" to use the Product and Manufacturing Information and "[redacted]." MPA § 10.4(C)–(D) (emphasis added). The MPA provided that these rights would be trigged upon certain specified contingencies, including CNEX's insolvency. MPA § 10.4(B). Based on the unambiguous language of the MPA, Google's rights are properly characterized as a license, not a security interest, as the contract does not provide for CNEX's payment or performance under the collateral. *See Google*, 2026 WL 1283924, at *1 ("Because the provision [of the MPA] does not secure the performance of an obligation under the collateral, it is not a security interest.").

The conduct of the parties to the contract (CNEX and Google) supports the unambiguous contract language. When CNEX shut down, the parties behaved as if Google had a license and access rights, rather than a security interest. For example, upon ceasing operations, CNEX informed the Vendors that the project "will be taken over by Google per the terms of the contract we had with them. The plan will be to continue the ramp just now as Google as your customer and not CNEX." ECF No. 251-5, Ex. 52 ([redacted]), Ex. 53 ([redacted]), Ex. 54 ([redacted]). Google then requested the Product and Manufacturing Information from escrow. ECF No. 253-2, Ex. 86. CNEX sent [redacted] a signed mask usage rights document, ECF No. 251-5, Ex. 9, and CNEX confirmed that Google may place orders directly with [redacted], ECF No. 253-2, Ex. 87. Emails from CNEX executives to PFI executives also explained that Google would be "going with the escrow trigger" provided in Section 10.4, "and not claiming exercise of [redacted]." ECF No. 251-5, Ex. 61; *see also* ECF No. 251-5, Ex. 60 (email from CNEX executive to PFI executives explaining that Section 10.4 "will likely be what Google is using to justify their position on taking over Raven A1 sourcing"). These facts, among others, are consistent with a collective understanding that Google bargained for license and access rights, not a security

United States District Court
Northern District of California

interest. PFI submits no evidence to the contrary, so this issue is undisputed in favor of Google.

Finally, PFI's reliance on *In re Storm Technology*, 260 B.R. 152 (Bankr. N.D. Cal. 2001), for the proposition that Google's rights are properly characterized as a security interest, Def. Mot. at 3; Def. Opp. at 15–16, falls apart under minimal scrutiny. For one thing, as PFI itself explains, the relevant part of the case is "dicta" that is "not perfectly analogous" and "distinctly applying bankruptcy law." Def. Opp. at 15. Moreover, *In re Storm* is readily distinguishable. The question there was whether a company could invoke section 365(n) of the Bankruptcy Code to enforce a license in intellectual property technology. *Id.* at 154. The relevant code section provided that if a bankruptcy trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, a licensee under that contract may elect to retain its rights where such rights existed immediately before the case commenced. *Id.* at 156. The bankruptcy court found that as of the petition date, the company's claimed license was not in effect and thus was unenforceable. *Id.* at 157. That issue is a far cry from the circumstances here, which are governed by the California Commercial Code. And in any case, Google's license and access rights attached in April 2024, long before CNEX filed for bankruptcy.

In light of the applicable authorities, the plain language of the contract, and the parties' course of conduct, the Court concludes that Section 10.4 created a license and access rights rather than a security interest.

**(3) Whether Google's Rights in Contract Are Subordinate to PFI's Security Interest**

PFI also argues that even if Section 10.4 created only contractual rights, then the license is subordinate to PFI's perfected security interest. Def. Mot. at 2–3. Under the California Commercial Code "[a] security interest . . . continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest." Cal. Com. Code § 9315(a)(1). Accordingly, "licensees' rights are subject to the security interest of the secured party and thus may be extinguished in a disposition of the collateral upon default." *See N. Star IP Holdings, LLC v. Icon Trade Servs., LLC*, 710 F. Supp. 3d 183, 200 (S.D.N.Y. 2024)).

As PFI acknowledges, Def. Mot. at 3–4, there is an exception to this general rule. "[A]

United States District Court
Northern District of California

licensee in ordinary course of business takes its rights under a nonexclusive license free of a security interest in the general intangible created by the licensor, even if the security interest is perfected and the licensee knows of its existence." Cal. Com. Code § 9321(b). At the preliminary injunction stage, the Court found that this exception was likely applicable, because the "MPA was negotiated in the ordinary course of business, and the license rights therein were granted at the time the MPA was executed, even if certain terms required a triggering event to become effective." PI Order at 9–10. PFI now contends that this exception is inapplicable because Google is not a licensee in the ordinary course of business, offering several arguments to support its position.

PFI argues that CNEX "was in the business of developing and selling computer chips—not licensing the implements of manufacturing to enable customers to produce chips themselves." Def. Mot. at 3; Def. Opp. at 16–17. Thus, transfer of the tools of production is, in PFI's view, "categorically outside the licensor's ordinary business." *Id.* In response, Google submits evidence demonstrating that CNEX's ordinary business was developing software and firmware for the manufacture and sale of integrated circuits or computer chips. *See* ECF No. 253-2, Ex. 119 (CNEX website). CNEX's founder and former CEO also testified that the MPA was "a pretty standard MPA," similar to ones it had negotiated with "Dell, Apple, [and] Microsoft . . . all with very similar language." Armstrong Depo. at 24:3–14. Google bargained for this provision because it "wanted protections" in case "CNEX went away." ECF No. 251-5, Ex. 21 ("DeFranco Depo.") at 24:8–25:9; *see also id.* at 30:6–21 (testifying that the "goal was to eliminate" the "risk associated with [CNEX] being a startup"). As "[a] person becomes a licensee in the ordinary course if the license to the person comports with the usual or customary practices in the kind of business in which the licensor is engaged or with the licensor's own usual or customary practices," Google contends its evidence establishes that it is a licensee in the ordinary course of business. *See* Cal. Com. Code § 9321(a).

PFI also urges that the transaction was not an ordinary course transaction because Google provided no new consideration for the Section 10.4 license at the time it was triggered. Def. Mot. at 3–4.; Def. Opp. at 17–18. The Court is in full agreement that "a buyer in ordinary course does

United States District Court
Northern District of California

not take free of a security interest in collateral when he fails to give new value for the collateral." *Producers Cotton Oil Co. v. Amstar Corp.*, 197 Cal. App. 3d 638, 654 (1988) (discussing *United States v. Handy & Harman*, 750 F.2d 777, 781–82 (9th Cir. 1984)). However, the Court rejects PFI's argument that CNEX's obligation to act under Section 10.4 arose when it closed its doors in 2024. To the contrary, Google's Section 10.4 rights originated when Google and CNEX executed the MPA, although those rights were made contingent on future events. Furthermore, Google points to evidence in the record showing that it provided consideration for its license and access rights over the course of its business relationship with CNEX, including because Google's Section 10.4 rights are not isolated from the rest of the MPA. Indeed, Section 10.4 was one of many terms that was bargained for in the MPA. Google submits evidence that it provided [redacted] in consideration over the course of its collaboration with CNEX. *See* Kelkar Decl. ¶ 17. Google also provides evidence that without the Section 10.4 rights, Google would not have entered into the MPA at all. Kelkar Decl. ¶ 34. This evidence is sufficient to show that Google provided new value for its license and access rights, because as those rights were bargained for when the parties engaged in contractual negotiations, Google provided consideration for those rights. And in its briefing, PFI does not identify any facts creating a dispute as to whether Google provided consideration for its rights under Section 10.4.

Moreover, as Google points out, Pl. Opp. at 15, Plaintiff's authorities are inapposite. In *Handy & Harman*, a metal dealer used inventory pledged to one creditor as payment of a debt owed to another company with which it regularly did business, 750 F.2d at 782. The Court found that using the inventory as payment of an existing debt was legal, but inconsistent with the new value requirement. *Id.* Thus, the Court found that the other company was not a buyer in the ordinary course of business, because it received no money to which a security interest could attach. *Id.* Likewise, in *Producers Cotton*, a buyer was not an ordinary course buyer, where part of what it paid to the seller was to satisfy a preexisting debt, and "[n]o new value was given," 197 Cal. App. 3d, at 654. The circumstances in those cases are readily distinguishable from the situation here, because as discussed above, Google submits evidence that the provision that license and access rights would be provided upon certain events was among many terms that CNEX and

United States District Court
Northern District of California

Google bargained for—and for which Google provided consideration.

Because there is conflicting evidence as to whether CNEX was conducting business with Google in the ordinary course, the Court finds that whether Google is a licensee in the ordinary course of business is a disputed factual question for trial. *See Google*, 2026 WL 1283924, at *1 (explaining that whether the licensee in the ordinary course exception applies is a factual question).

**(4) Whether the Section 10.4 Rights Are Voidable**

PFI also asserts that Google's rights under Section 10.4 of the MPA are voidable under California's Uniform Voidable Transactions Act. Def. Opp. at 18–19 (citing Cal. Civ. Code § 3439 et seq.). PFI refers the Court to California Civil Code section 3439.05, which provides that:

> [a] transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Cal. Civ. Code § 3439.05(a).

In the preliminary injunction order, the Court found that the license granted to Google under Section 10.4 of the MPA is not voidable under this provision. PI Order at 10–11. The Ninth Circuit affirmed, finding that "[c]onsideration given in the MPA supports the obligations in Section 10.4." *Google*, 2026 WL 1283924, at *2. Now at the summary judgment stage, PFI again argues that each requirement of the statutory provision is satisfied. Analyzing the issue afresh with the benefit of the developed record, the Court disagrees with PFI for two critical reasons.

First, with respect to the issue of timing, Google's interest predated, not postdated, PFI's security interest. It is true that PFI perfected its security interest in CNEX in November 2021. *See* Security Agreement. However, the MPA was executed in August 2016. *See* MPA. PFI argues that Google's rights are subordinate because they vested only upon CNEX's 2024 closure and thus were acquired *after* PFI's security interest was perfected. Def. Opp. at 18–19. This argument is unpersuasive. As the Court explains above, Google's Section 10.4 rights are not isolated from the rest of the contract. The fact that the license and access rights were made contingent on future

United States District Court
Northern District of California

events does not undermine the fact that CNEX's obligation to act under Section 10.4 arose in 2016 when the MPA was executed, well before PFI perfected its security interest.

Second, as the Court discusses above, the record demonstrates that Google provided consideration in exchange for its Section 10.4 rights. Google submits evidence showing that "[t]he bargained-for terms in Section 10 of the MPA were a material part of Google's decision to enter into the MPA." Kelkar Decl. ¶¶ 33–34. Google paid CNEX $[redacted] as consideration for its services. Kelkar Decl. ¶ 17. The Court is thus unpersuaded by PFI's argument and concludes that Google's license is not voidable under the California Uniform Voidable Transactions Act.

**(5) Whether PFI Asserted Its Rights in Good Faith**

Finally, PFI argues that it cannot be held liable for tortious interference because it merely communicated its rights to the Vendors in good faith. Def. Opp. at 6, 19. As PFI correctly observes, a "creditor's good faith and non-frivolous assertion of competing legal rights" can justify intentional interference with contractual relations. Def. Opp. at 6 (citing *Quelimane*, 19 Cal. 4th at 55–56). Where a party has established a legally protected interest, the "determinative question . . . becomes whether their claim was asserted in good faith." *See Richardson*, 98 Cal. App. 3d at 81. "Something other than sincerity and an honest conviction by a party in his position is required before justification for his conduct on the grounds of 'good faith' can be established. There must be an objective basis for the belief." *Id.* at 82.

Here, PFI is correct that there is evidence in the record that PFI's executives professed their belief that under the terms of the security agreement, PFI had the superior rights to CNEX's collateral. For example, PFI's CEO, Michael O'Malley, testified that PFI's view was that "we were on firm ground, firmly documented as a lienholder, and that our contracts were very clear, Google knew that we were the lender investor and that we sort of figured that it was just commonplace . . . Our position all along was our UCC trumps the license rights." O'Malley Depo. at 141:6–142:5. Although there is evidence in the record demonstrating PFI's "sincerity" and "honest conviction," *Richardson*, 98 Cal. App. 3d at 82, it is limited to PFI's self-serving testimony as to its good faith, which does not save it. That is because Google identifies evidence

in the record showing that PFI had no "objective basis" for its belief, which belies PFI's claim of good faith. *Richardson*, 98 Cal. App. 3d at 82. For example, CNEX's counsel advised PFI in 2023 that "the escrow provision in the MPA contemplates a release in the event of bankruptcy or related events and grants Google a royalty-free license to make and have made Product, possibly making the [redacted] license (and thus the need to pay royalties) superfluous." ECF No. 251-5, Ex. 51. PFI's own counsel likewise told PFI in June 2024 that Section 10.4 "specifically provides that if the software is released from escrow, Google has [the] irrevocable right to make derivative works solely to make the Product solely for Google's internal use." ECF No. 251-5, Ex. 49 at 4989. CNEX's former CEO, Bill Moore, emailed PFI executives in March 2024, similarly explaining that "Google has the right to use all Raven IP (including mask sets) to manufacture Raven for themselves, without paying further fees to CNEX." ECF No. 251-5, Ex. 58. With this information in hand, PFI has no evidence demonstrating that it had an objective basis for the assertion of its rights, and PFI does not identify any contrary evidence demonstrating an objective basis to support its belief.

In sum, while the record may support a plausible inference of PFI's "sincerity" and "honest conviction" as to the superiority of its rights, PFI's claim of good faith is undermined by the absence of evidence in the record showing any "objective basis for the belief," which is a critical aspect of a claim of good faith under California law. *See Richardson*, 98 Cal. App. 3d at 82. To the contrary, Google has identified evidence that CNEX's lawyer, PFI's own lawyer, and others who were knowledgeable about the contract clearly and directly informed PFI that Google had continuing license and access rights under Section 10.4 of the MPA. The Court thus finds that PFI has not met its burden to establish that it asserted its rights in good faith.

**ii. Privilege**

Separate from the justification defense, PFI argues that its communications are protected under the *Noerr-Pennington* doctrine and California's litigation privilege. Def. Opp. at 9–10. Google responds that both privileges are inapplicable. Pl. Reply at 5–10.

**(1) *Noerr-Pennington* Doctrine**

PFI asserts that the Vendor emails are protected as petitioning activity under the *Noerr-*

*Pennington* doctrine, which provides that "those who petition any department of the government for redress are immune from statutory liability for their petitioning conduct." *See Theme Promos., Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1006 (9th Cir. 2008). The doctrine also applies to state law claims. *Id.* at 1007. Google responds that PFI has not met its burden to establish that the emails were petitioning activity. Pl. Reply at 5–6. Google also argues that even if the *Noerr-Pennington* doctrine were applicable, PFI's conduct would fall into the "sham" litigation exception. *Id.* at 6–10.

*Noerr-Pennington* is an affirmative defense to liability, so PFI bears the burden to establish its applicability. *See Schrader Cellars, LLC v. Roach*, 129 F.4th 1115, 1125 n.12 (9th Cir. 2025). Yet PFI's entire argument regarding the *Noerr-Pennington* doctrine is 11 lines of text. *See* Def. Opp. at 9. In this limited discussion, PFI refers the Court to *Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006), in support of its contention that the Vendor emails are protected as "petitioning conduct." In *Sosa*, the defendant sent tens of thousands of demand letters, stating that the recipients had accessed the defendant's satellite television signal illegally and would be sued if they did not settle the claims. *Id.* at 925–26. The defendant contended that sending the demand letters was conduct immunized from liability under the *Noerr-Pennington* doctrine, which protects "petitions sent directly to the court in the course of litigation," as well as "conduct incidental to the prosecution of a suit." *Id.* at 929, 935. In analyzing whether the pre-suit demand letters constituted conduct incidental to the prosecution of a suit, the Ninth Circuit explained that there is some activity that must be protected to "afford breathing space to the right of petition guaranteed by the First Amendment." *Id.* at 933. The Ninth Circuit "conclude[d] that restrictions on presuit demand letters may . . . raise substantial Petition Clause issues if, on examination, such restrictions could impair the right of access to the courts protected by the First Amendment" due to the close relationship between pre-suit letters and access to the courts. *Id.* at 936. The *Sosa* court further found that the *Noerr-Pennington* doctrine protected the letters in that case as incidental to petitioning activity. *Id.* at 942.

Like in *Sosa* where the defendant sent pre-suit demand letters, here, PFI sent emails to the Vendors, for example notifying them "that the continued use of any equipment or software

belonging to CNEX, including without limitation the following described equipment, is a violation of PFI's rights as [a] secured party and wrongful conversion of such property [is] actionable under US Law." ECF No 251-5, Ex. 62, Ex. 63, Ex. 64. However, the facts here differ from those in *Sosa* in an important way. In *Sosa*, the defendant threatened the *recipients* of its demand letters with lawsuits. *See Sosa*, 437 F.3d at 925–26. Here, by contrast, PFI expressly disclaims that it threatened legal action against the Vendors and it proffers evidence intended to show that the Vendors did not believe they were being threatened with suit. *See* Def. Opp. at 2–3 ¶¶ 9–10 (citing the deposition of [redacted]'s representative, who testified that his impression was that PFI's emails threatened legal action against Google, not [redacted]). PFI, instead, claims that the emails to the Vendors were intended to get Google's attention. *See* O'Malley Depo at 144:15–21. Accordingly, *Sosa*'s holding that the demand letters were intimately connected to the "right of access to the courts protected by the First Amendment," 437 F.3d at 936, does not directly bear on the situation here.

In fact, PFI cites no case where sending letters to one party with the intent to threaten another with suit was protected under the *Noerr-Pennington* doctrine. When pressed by the Court at the hearing, PFI cited *Theme Promotions*. In *Theme Promotions*, the Ninth Circuit found that pre-suit letters sent to third parties indicated that the third parties "could become embroiled in then-ongoing litigation" and were therefore incidental to petitioning activity. *See Theme Promos.*, 546 F.3d at 1008. The letters there, like those in *Sosa*, were intended to threaten the recipients of the letters with litigation. Here, by contrast, PFI concedes that it intended to threaten Google, not the Vendors.

Under *Sosa*, no case authority supports the proposition that a demand letter sent to one party with the intent to threaten another with suit is protected conduct, and the Court does not read *Sosa* so broadly. However, even if *Sosa* stood for the proposition that the *Noerr-Pennington* doctrine applies to all pre-suit demand letters, the Court finds that Google has proved that the emails to the Vendors fall into the "sham litigation" exception. Even where conduct incidental to a lawsuit "falls within the protection of the Noerr–Pennington doctrine . . . [p]re-suit letters threatening legal action may nevertheless be restricted by law where they include representations

so baseless that the threatened litigation would fall into the 'sham litigation' exception." *Theme Promos*, 546 F.3d at 1007 (citing *Sosa*, 546 F.3d at 936–38). "[A] proceeding is a 'sham' (1) 'where the lawsuit is objectively baseless,' and (2) where 'the defendant's motive in bringing it was unlawful.'" *Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 931 (9th Cir. 2004) (quoting *Sosa*, 437 F.3d at 938). "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." *Id.* at 932 (citation omitted).

Beginning with the first prong of the analysis, a lawsuit is "objectively baseless" where "no reasonable litigant could reasonably expect success on the merits." *Theme Promos*, 546 F.3d at 1007. Considering the emails at face value, the Court finds that the threatened lawsuits against the Vendors were objectively baseless, because, on the record before the Court, there is no basis from which to assert that the Vendors' conduct in fulfilling contracts with Google violated PFI's rights.

The Court also finds that PFI's motive in sending the emails to the Vendors was unlawful. In *Rock River Communications v. Universal Music Group, Inc.*, the defendant sent cease and desist letters to the plaintiff's business partners despite an awareness of its "tenuous" legal claim, and then failed to ever initiate a lawsuit against those business partners, 745 F.3d at 352. The Ninth Circuit held that a reasonable jury could find that the "transmission of cease-and-desist letters but failure to initiate litigation" indicated that the defendant sought to enforce its claim "through the *threat* of litigation rather than through actual litigation." *Id.* at 353. Here, like in *Rock River*, PFI was aware of the tenuousness of any claim against the Vendors. As the Court discusses above in section III.A.1.f.i(5), PFI was told by its own lawyer, CNEX's lawyer, and CNEX executives that Google had license and access rights under the MPA. *See, e.g.*, ECF No. 251-5, Ex. 49 at 4989, Ex. 51, Ex. 58. Yet PFI disregarded that information, emailed the Vendors anyway, and, like the defendant in *Rock River*, has never initiated a lawsuit against the Vendors. There is also evidence that PFI never intended to sue the Vendors. PFI's CEO, Michael O'Malley, testified that the purpose of the Vendor emails—which threatened litigation—was to "get [Google's] attention and have people come to the table." O'Malley Depo at 144:15–21. This evidence illustrates that PFI hoped to enforce its claim "through the *threat* of litigation rather than

through actual litigation." *Rock River*, 745 F.3d at 353. In sum, the Court concludes that even if the *Noerr-Pennington* doctrine were applicable, Google has shown that the Vendor emails were a sham and are thus unprotected.

**(2) California's Litigation Privilege**

Separately, PFI argues that its conduct is privileged under California's litigation privilege. Def. Opp. at 9–10. California Civil Code section 47(b) protects "any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1057 (2006) (citation omitted).

California's litigation privilege is an affirmative defense. *Edwards v. Centex Real Est. Corp.*, 53 Cal. App. 4th 15, 37 (1997). And as Google correctly points out, PFI did not plead California's litigation privilege in its answer. *See* Pl. Reply at 10. Generally, "defendants must raise affirmative defenses in their initial pleadings. However, defendants may raise an affirmative defense for the first time in a motion for summary judgment only if the delay does not prejudice the plaintiff." *Magana v. Com. of the N. Mariana Islands*, 107 F.3d 1436, 1446 (9th Cir. 1997), *as amended* (May 1, 1997). Google contends that it has been prejudiced by PFI's raising the California litigation privilege for the first time in opposition to Google's motion for partial summary judgment. Pl. Reply at 10. The Court agrees. The delay in the assertion of this privilege has impacted Google's litigation strategy and opportunity to respond, including because fact discovery has closed. Accordingly, the Court finds that PFI has waived the defense of California's litigation privilege.

* * *

For the foregoing reasons, the Court GRANTS Google's motion for summary judgment as to its claim for tortious interference with contractual relationships, subject to PFI's affirmative defense that its conduct was legally justified because its rights take priority. In particular, the issue of whether Google's rights under Section 10.4 were extinguished because it is not a licensee in the ordinary course of business is a disputed factual issue for trial.

### 2. PFI's Motion for Summary Judgment

Turning to PFI's motion, PFI contends that it is entitled to summary judgment as to Google's tortious interference claim because PFI's security interest is superior to Google's rights under Section 10.4 of the MPA, thereby justifying its emails to the Vendors in which it asserted its rights as a perfected secured creditor. Def. Mot. at 1–3. In support of this contention, PFI argues that Section 10.4 of the MPA created a security interest that Google never perfected. In the alternative, PFI argues that if Google's rights are solely contractual, PFI's perfected security interest still takes priority because Google is not a licensee in the ordinary course of business and thus Google's license was extinguished in the disposition of CNEX's collateral.

For the reasons stated above in section III.A.1.f.i(2), the Court finds that Section 10.4 of the MPA did not create a security interest. For the reasons set forth in section III.A.1.f.i(3), the Court finds that whether Google is a licensee in the ordinary course of business—and therefore whether Google's rights under Section 10.4 were extinguished—is a disputed issue of fact to be determined at trial. Accordingly, PFI's motion for summary judgment as to Google's tortious interference claim is DENIED.

* * *

In summary, the Court GRANTS Google's motion for summary judgment as to its claim for tortious interference with contractual relationships, subject to PFI's affirmative defense of justification. In particular, the issue of whether Google is a licensee in the ordinary course of business, and thus whether Google's rights were extinguished, is a disputed issue of fact for trial. The Court DENIES PFI's motion for summary judgment as to Google's claim for tortious interference on the grounds that Section 10.4 of the MPA did not create a security interest and whether Google is a licensee in the ordinary course of business is a triable factual question.

## B. PFI's Motion Re Whether Section 10.4 of the MPA Limits Google's Rights

In its motion, PFI seeks summary judgment that Section 10.4 of the MPA only granted Google rights to make the number of Chips provided for under the SOW existing at the time of the triggering event. Def. Mot. at 4–6. As this argument is based solely on contract interpretation and not factual evidence, it is appropriate for the Court to evaluate this issue as a matter of law.

United States District Court
Northern District of California

PFI's argument proceeds as follows. First, PFI looks to Section 10.4(C) of the MPA, which provides for the springing license "[redacted]." MPA § 10.4(C). Because the MPA set out general terms and did not call for any deliverables, PFI argues that for the springing license to be in accordance with the terms of the various contracts outlined in the MPA, Google's rights are limited to finishing out CNEX's then-existing contractual obligations. And SOW Amendment 5, which existed at the time CNEX closed its doors, provided for Google to order, and for CNEX to produce and deliver, 200,000 Chips. ECF No. 250, Ex. G ("Amendment 5"). PFI thus maintains that Google's rights are limited to those 200,000 Chips. In response, Google argues that PFI's reading is contrary to the plain language in the MPA, which provides for a license that is "perpetual" and "irrevocable." Pl. Opp. at 16–17 (citing MPA § 10.4(C)). Google urges that to find that "perpetual" rights expire upon completion of a SOW is at odds with the most straightforward reading of the contract, and no other evidence exists to support PFI's position.

Google has the better argument. The Court finds that nothing in the record supports the conclusion that Google's license and access rights would expire upon the completion of the work provided for in the SOW, including because those rights are described as "perpetual" and "irrevocable." In addition to the plain language, the parties' course of conduct, discussed in detail above, is likewise consistent with the conclusion that Google's rights were intended to survive the completion of the work provided for in the SOW. As one example, when CNEX ceased operations, it confirmed with one of the Vendors that Google would begin placing orders directly. *See* ECF No. 253-2, Ex. 87.

PFI argues that the fact that certain of the license-triggering events are less extreme than CNEX's insolvency makes obvious "the injustice of Google's proffered interpretation." Def. Mot. at 5. The Court disagrees. To be sure, as PFI argues, certain of the triggering events are less dramatic than CNEX's insolvency, including a two-month supply disruption or a drop in CNEX's credit rating. *See* MPA § 10.4(B)(1), (5). That fact does not alter the plain language of the contract, however, which provides for a license that is perpetual and irrevocable upon the

United States District Court
Northern District of California

enumerated events. Moreover, Google provides testimony from CNEX's former VP of sales that the very purpose of Section 10.4 was to "eliminate some of [the] risk" of CNEX "being a startup," which meant that Google bargained for protections to make it "more comfortable to move . . . forward." DeFranco Depo. at 30:6–21. While some of the triggering events may be less sensational than CNEX's closure, they are nonetheless indications of the kind of risk that Google bargained with CNEX to eliminate. Accordingly, the Court is not persuaded to adopt PFI's alternative reading of the contract.

**C. PFI's Motion Re Misappropriation of Trade Secrets**

PFI moves for summary judgment as to Google's trade secret claims on the grounds that Google has not identified any trade secrets, any asserted trade secrets do not derive economic value from not being generally known, and any trade secrets are not discernable in the CNEX assets. Def. Mot. at 7–14. Google responds that PFI disregards disputed evidence as to each of these issues. Pl. Opp. at 17–22.

Google brings claims under DTSA and CUTSA, seeking to enjoin PFI from selling its trade secrets to third parties. Compl. ¶¶ 129–58. At a high level, Google asserts that it provided trade secrets to CNEX, which are embedded in the Product Manufacturing Information and the Customized Software and Tooling used to manufacture and test the Chips. *See, e.g.*, *id.* ¶ 132. Thus, according to Google's allegations, the sale of CNEX's assets that include Google's IP would constitute misappropriation of trade secrets. *See, e.g.*, *id.* ¶ 139. At the preliminary injunction stage, the Court found that Google had shown a likelihood of success on the merits with respect to demonstrating the existence of its trade secrets. PI Order at 16. However, Google had not met its burden with respect to misappropriation, because it had not shown that its trade secrets would be disclosed through the sale of any of CNEX's assets. *See id.* at 20–21.

Courts often analyze claims under the DTSA and the CUTSA together, because "the elements are substantially similar." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020). To succeed on a claim for misappropriation of trade secrets under either act, a plaintiff must prove: "(1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to

United States District Court
Northern District of California

the plaintiff." *Nat'l Specialty Pharmacy, LLC v. Padhye*, 734 F. Supp. 3d 922, 929 (N.D. Cal. 2024) (quoting *InteliClear*, 978 F.3d at 657–58) (discussing DTSA); *CytoDyn of New Mexico, Inc. v. Amerimmune Pharms., Inc.*, 160 Cal. App. 4th 288, 297 (2008) ("Under the UTSA, a prima facie claim for misappropriation of trade secrets 'requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff.'").

**1. Contractual Backdrop**

Because an overview of the relevant portions of the underlying contractual agreements is helpful to contextualize Google's trade secret claims, the Court walks through the relevant provisions. The MPA provides that that the parties had "Background IP" that they owned prior to the collaboration, and that they would continue to own. MPA, attach. C §§ 1.1, 4.1. Separately, pursuant to the MPA and SOW, "Google [redacted]" unless otherwise specified in an applicable SOW. MPA, attach. C § 4.3(B). Developed IP is defined under the MPA as "[redacted].'" MPA, attach. C § 1.2. Google expressly granted CNEX a limited, non-transferable license to use its Background IP and Developed IP solely for the purpose of "[redacted]." MPA, attach. C § 5.1.

In essence, the basis for Google's trade secret claims is that it provided CNEX with its trade secrets for the purpose of carrying out the collaboration (Background IP) and came to own other trade secrets as a consequence of the collaboration (Developed IP). Moreover, according to Google, the sale of certain of CNEX's assets—which integrate both Background and Developed IP—would threaten to expose Google's trade secrets.

**2. Ownership of Trade Secrets**

As a threshold matter, PFI contests the existence of Google's trade secrets, arguing that Google never provided CNEX with any trade secrets, there was no Developed IP, and any Google trade secrets do not derive any value from not being generally known. Relevant here, the DTSA defines "trade secret" as:

> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
>
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]

18 U.S.C. § 1839(3). The CUTSA defines "trade secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d). The Court considers whether the asserted trade secrets meet this definition.

**a. Whether Google Provided Trade Secrets to CNEX**

PFI first argues that Google cannot show that it provided trade secrets to CNEX because "each of the supposed trade secrets identified by Google are either public knowledge, not owned by Google, or both." Def. Mot. at 9–12. In opposition, Google contends that whether it provided trade secrets to CNEX is a disputed issue of material fact, asserting that its trade secrets are comprised of custom [redacted] technology, custom [redacted] specifications, unique [redacted] technology, [redacted] plans, and information on Google's infrastructure network. Pl. Opp. at 18 (citing Desai Decl. ¶¶ 14–16).

PFI identifies evidence in the record that Google's asserted trade secrets are not trade secrets at all but are instead publicly known methods or ideas. For example, CNEX's CEO, Bill Moore, who has a master's degree in computer science and more than three decades of industry experience, testified that "[redacted]" is a "widely used term in technology," the

United States District Court
Northern District of California

"first time I heard this term used was probably early 2000s," and he was "not aware that there is a unique way that Google does this." ECF No. 250-1, Ex. K ("Moore Depo.") at 57:21–58:19. Likewise, Bill Moore testified that [redacted] is a "well known thing in the industry and was not invented by Google." Moore Depo. at 55:4–10. Bill Moore's predecessor as CNEX's CEO, Alan Armstrong, testified that Google provided only "very high level, and verbal" [redacted] plans to CNEX, and did not recall Google ever claiming such plans constituted trade secrets. ECF No. 250-1, Ex. J at 71:22–72:10. As Google must identify trade secrets with sufficient particularity, and as "'catchall' phrases" and "categories of trade secrets" are not sufficient to establish ownership of trade secrets, *InteliClear, LLC*, 978 F.3d at 658, the Court finds that PFI has met its moving burden to establish that Google did not provide CNEX with trade secrets. The burden shifts to Google to identify triable factual issues.

In response, Google submits evidence sufficient to show a contested factual issue as to whether the custom specifications are "information" that is not generally known and that Google takes reasonable steps to keep secret. For instance, Google conveyed custom specifications to CNEX through a Google shared drive and "[a]ccess to the Shared Drive was strictly guarded," such that not even former CNEX CEOs Alan Armstrong or Bill Moore were authorized users of the drive. ECF No. 253-2, Ex. 90 ("Mahony Decl.") ¶¶ 8–10. Moreover, Google points to a declaration from its Engineering Director for Platforms Compute & Storage Software describing the functions and features of its asserted trade secrets. Desai Decl. ¶¶ 14–31. In sum, Google identifies evidence in the record sufficient to support a reasonable conclusion that it provided CNEX with trade secrets consisting of custom [redacted] technology, custom [redacted] specifications, unique [redacted] technology, [redacted] plans, and information on Google's infrastructure network. Accordingly, whether Google provided CNEX with trade secrets is a disputed issue of fact.

**b. Economic Value from Not Being Generally Known**

Next, PFI asserts that there is no evidence in the record that the asserted trade secrets derive any value from not being generally known. Def. Mot. at 13. Google responds that, to the contrary, it is undisputed that its trade secrets are economically valuable. Pl. Opp. at 19–20. "To

United States District Court
Northern District of California

have independent economic value, a trade secret must be sufficiently valuable and secret to afford an actual or potential economic advantage over others." *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1052 (N.D. Cal. 2020) (citation omitted).

In support of its argument, PFI points to testimony from Google's corporate representative, who could not say whether one of Google's purported trade secrets derives value from not being generally known. ECF No. 250-1, Ex. N ("Desai Depo.") at 152:21–153:5 ("Q. Is there value to Google to [the feature] not being known? A. I can't say."). Accordingly, the Court finds that PFI has met its moving burden to demonstrate that Google's trade secrets do not derive economic value from not being generally known. The burden shifts to Google to identify disputed factual issues in the record.

For its part, Google points to PFI's motion to convert in the bankruptcy litigation, which asserted that the sale of the CNEX assets could derive substantial revenue in the marketplace. *See* Motion to Convert ¶¶ 36–43. In particular, PFI contended that revenue from the sale of the technology could come from "a combination of license sales and the commercialization of market ready [Chips]." Motion to Convert ¶ 43. Drawing all inferences in favor of Google as the nonmoving party, the Court finds that PFI's assertions in its motion to convert support a reasonable inference that Google's trade secrets used in the at-issue technology derive economic value from not being generally known. A reasonable jury could thus find that the alleged trade secrets obtain value from remaining unknown to the public.

* * *

In sum, the Court concludes that there are disputed factual issues as to whether Google provided trade secrets to CNEX and whether Google's asserted trade secrets derive value from not being generally known. Accordingly, triable issues exist as to the first element of Google's trade secret claims—Google's ownership of trade secrets.

**3. Misappropriation**

PFI argues that even if Google has trade secrets, there is no evidence that any of the trade secrets are discernable in the CNEX assets. Def. Mot. at 13–14. Therefore, PFI argues, it cannot misappropriate trade secrets by selling CNEX's assets. *Id.* In response, Google urges that its

United States District Court
Northern District of California

custom specifications and trade secrets are so fundamentally incorporated into the Customized Software and Tooling that PFI's selling CNEX's assets would give rise to trade secret misappropriation. Pl. Opp. at 20–22.

As an initial matter, the Court observes three distinct components of the at-issue intellectual property: the Chips themselves, the mask sets, and the underlying software code. The Court considers the evidence submitted as to each component in turn.

First, as to the mask sets, CNEX's former CEO Alan Armstrong expressly testified that it would not be possible to determine the underlying code from a mask set. ECF No. 250-1, Ex. J at 52:19–24 ("Q. Do you have any understanding as to whether someone in the field could take a mask and know what the code is? A. No, they could not. Q. You don't know either way? A. They could not."). Google's representative did not contradict that statement, indicating only that she was not sure whether it would be possible to discern the trade secrets from the mask sets. *E.g.*, Desai Depo. at 148:2–4 ("Q. If I had a mask, could I determine what that [redacted] is? A. I don't know.").

PFI also identifies evidence that it would not be possible to extract trade secrets from the code itself. Google's representative testified that she did not know whether it would be possible. Desai Depo. at 148:5–7 ("Q. If I had the source code, could I determine what that [redacted] is? A. I don't know."); *id.* at 151:25–152:18 ("Q. If they had the CNEX source code, could they determine [what the [redacted] feature is and how it works] . . . ? A. In the source code, they can see [a variable name in the code that identifies the feature]. . . . Q. [Would] a name in the code, would that give them enough information to recreate [the feature]? A. It could, but I don't know.").

As to the Chips themselves, Google's representative testified that she was unsure whether any trade secrets could be discerned from the Chips, stating that she was "guessing" when she suggested that "someone who has malicious intent c[ould] figure . . . out" Google's trade secrets via reverse engineering. *Id.* at 89:10–25; *see also id.* at 151:15–21 ("Q. [redacted] feature. Okay. So if I had the chip . . . not I, but somebody skilled, somebody with the best skills in the industry, could they determine what this [redacted] feature is and how it works? A. I don't

know.”). Even if the Chips were, in theory, susceptible to reverse engineering, Google’s representative testified that it would “take countless hours” and “might be impossible.” Desai Depo. at 89:2–20. Going further, former CNEX CEO Bill Moore testified that it would not be feasible to do so as a practical matter. Moore Depo. at 63:7–25.

PFI also points out that Google’s contracts with CNEX [redacted]. SOW § 7.1 (“[redacted].”). By Google’s own admission, it “would have objected” to CNEX selling the Chips to other entities “[i]f there were trade secrets” accessible therein. Desai Depo. at 38:13–39:3. Thus, that Google contracted to [redacted] evinces that Google itself did not believe its trade secrets would be discernable from the Chips.

In light of the foregoing, the Court finds that PFI has met its moving burden to establish that Google’s trade secrets are not discernable in the CNEX assets. The evidence that PFI identifies demonstrates that the trade secrets are so integrated into the Customized Software and Tooling, Product and Manufacturing Information, and the Chips themselves, that they are not extractable. The burden shifts to Google to identify material facts in dispute.

In opposition, Google asserts that its trade secrets are fundamentally entwined with Customized Software and Tooling and Product and Manufacturing Information and it is disputed whether they are extractable. Pl. Opp. at 20–22. For instance, Google identifies a CNEX [redacted] Project Firmware Design document that in turn links to the [redacted] Guide, a file containing Google’s custom specifications and requirements. ECF No. 253-2, Ex. 106 at 17 (linking to ECF No. 253-2, Ex. 99). Indeed, Google has identified evidence demonstrating that the fingerprints of its trade secrets are so integrated into the Customized Software and Tooling that their sale could plausibly expose trade secrets. With respect to the final, manufactured Chips themselves, however, Google does not submit any evidence that its trade secrets would be threatened by sale of the finished product. Google admits that it “would have objected” to CNEX selling the Chips to third parties “[i]f there were trade secrets” therein. Desai Depo. at 38:13–39:3. Insofar as CNEX had a [redacted]



United States District Court
Northern District of California

[redacted], doing so would not misappropriate any trade secrets, and Google does not identify any evidence to the contrary.

* * *

The Court concludes that there are factual disputes as to whether Google's trade secrets are discernable in the Customized Software and Tooling, and PFI's motion is DENIED to the extent that it seeks summary judgment as to the underlying technology and the blueprint to make the Chips. Separately, the Court concludes that it is undisputed that the sale of the Chips themselves does not threaten to expose Google's trade secrets, and PFI's motion is GRANTED as to the final, manufactured Chips.

**D. Cross Motions Re Unjust Enrichment**

The parties both move for summary judgment as to PFI's counterclaim for unjust enrichment. In its operative pleading, PFI alleges that Google was enriched by receiving the benefits of CNEX's intellectual property without paying a royalty or otherwise compensating CNEX or PFI. *See* Counterclaim ¶¶ 5–9.

**1. Google's Motion for Summary Judgment**

In its motion, Google argues that under California law, unjust enrichment is not a standalone cause of action, but rather a theory underlying another claim. Pl. Mot. at 18–19. Google also contends that claims for unjust enrichment fail where, as here, the parties have an enforceable contract. Pl. Mot. at 19. In opposition, PFI asks the Court to construe the unjust enrichment claim as a quasi-contract claim seeking restitution based on Chips that Google ordered before CNEX ceased operations but never paid for. Def. Opp. at 22.

The Court agrees with Google that PFI's argument at summary judgment as to its unjust enrichment claim gives rise to an entirely new theory of liability, untethered to the claim set forth in the operative pleading. *See* Pl. Reply at 11. PFI's claim is also precluded because "[u]njust enrichment is not available for restitution where parties have an enforceable contract, unless the contract was procured by fraud or is unenforceable or ineffective for some reason, or where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct." *Stapleton v. JPMorgan Chase Bank, N.A.*, 779 F. Supp. 3d 1059, 1075 (N.D. Cal. 2025) (citation



United States District Court
Northern District of California

and internal quotation marks omitted). For the purposes of this claim, PFI stands in the shoes of CNEX. Accordingly, as the Court explains above, there is a valid, enforceable contract governing the relationship between the parties—the MPA. Accordingly, Google's motion for summary judgment as to PFI's unjust enrichment claim is GRANTED.

**2. PFI's Motion for Summary Judgment**

In its motion, PFI argues it is entitled to summary judgment in connection with its unjust enrichment claim because Google ordered, but did not pay for, Chips ordered before CNEX closed its doors. Def. Mot. at 14–15. For the same reasons the Court granted Google's motion for summary judgment as to PFI's unjust enrichment claim, the Court DENIES PFI's motion for summary judgment.

**E. Google's Motion Re Declaratory Judgment – Future Royalties**

Google moves for summary judgment as to PFI's counterclaim for declaratory judgment – future royalties. Pl. Mot. at 19–20. Google argues that under the MPA, Google's license and access rights to continue manufacturing the Chips arise from Sections 10.1 and 10.4 of the contract, which permits Google to produce the Chips without paying a royalty. *Id.* As it does in connection with the tortious interference claim, PFI contends that Google does not have a royalty-free license and so Google's motion must be denied as to its claim for declaratory relief as to future royalties. Def. Opp. at 25.

In its operative pleading, PFI alleges that, if Google has a license to continue to use CNEX's intellectual property, PFI is entitled to a declaratory judgment that Google must pay PFI a royalty at the contract rate specified in the CNEX Agreements for all units of the "Product" it manufactures directly or indirectly. *See* Counterclaim ¶¶ 22–25. Whether Google owes PFI royalties depends upon whether Google has existing royalty-free license and access rights to CNEX's intellectual property under the MPA. In turn, whether Google's license rights were extinguished upon the disposition of CNEX's collateral is contingent on the disputed factual issue of whether Google is a licensee in the ordinary course of business, discussed above in connection with the parties' cross motions for summary judgment as to Google's tortious interference claim. *See supra* § III.A.1.f.i(3). If Google prevails on this question at trial and shows that it is a licensee

United States District Court
Northern District of California

in the ordinary course of business, it is entitled to judgment as to this claim. Accordingly, Google's motion for summary judgment as to PFI's counterclaim for declaratory judgment – future royalties is DENIED as contingent on the question of whether Google is a licensee in the ordinary course of business.

**F. Google's Motion Re Declaratory Judgment – Voidable Transaction**

Google moves for summary judgment as to PFI's counterclaim for declaratory judgment – voidable transaction. Google contends that PFI's assertion that Google's Section 10.4 rights are voidable "ignores controlling caselaw, contradicts the plain language of the MPA and is essentially a plea for this Court to rewrite the MPA." Def. Mot. at 20–21.

In its counterclaim, PFI seeks a declaratory judgment that any license for Google to use CNEX's intellectual property is voidable under California's Uniform Voidable Transactions Act sections 3439.04 and 3439.05. *See* Counterclaim ¶¶ 10–21. PFI's counterclaim for declaratory judgment – voidable transaction rises and falls with PFI's argument that Google's rights are voidable under the California Uniform Voidable Transactions Act, which PFI raises as an affirmative defense to Google's motion for summary judgment as to its tortious interference claim. *See supra* § III.A.1.f.i(4). As the Court explains above in connection with that issue, Google's license and access rights became effective in 2016 and Google paid substantial consideration for those rights. Accordingly, Google's license is not voidable under California's Uniform Voidable Transactions Act. PFI does not identify any material facts in dispute as to this issue, so the Court GRANTS Google's motion for summary judgment with respect to PFI's declaratory judgment – voidable transaction claim.

**G. Cross Motions Re Open Account**

Finally, both Parties seek summary judgment as to PFI's claim for open account. Google argues that it owes nothing to CNEX. PFI asserts that it is undisputed that Google owes CNEX for Chips that were ordered before CNEX ceased operations but were not paid for. In the alternative, PFI argues that Google owes CNEX $200,288 for an initial shipment of [redacted] Chips that were delivered and invoiced before CNEX shut down.

In its operative pleading, PFI alleges that Google owes CNEX approximately $2,000,000

United States District Court
Northern District of California

for goods delivered, which PFI asserts it has a right to collect. *See* Counterclaim ¶¶ 26–29. The source of this claim is Google's Purchase Order Number 4301117892 dated August 14, 2023, in the amount of $[redacted], for the delivery of [redacted] Chips. ECF No. 251-5, Ex. Z ("PO '892"). It was directed at CNEX before it ceased operations. *Id.*

To prevail on its open account claim, PFI must establish that (1) Google and CNEX had financial transactions; (2) CNEX kept an account of the debits and credits involved in the transactions; (3) Google owes CNEX money on the account; and (4) the amount of money that Google owes CNEX. *See State Comp. Ins. Fund. v. ReadyLink Healthcare, Inc.*, 50 Cal. App. 5th 422, 449 (2020).

For the reasons discussed below, the Court DENIES Google's motion and GRANTS PFI's alternative motion for judgment in the amount of $200,288 for the initial delivery of Chips, subject to offsets to be determined at trial.

**1. Google's Motion for Summary Judgment**

In its motion, Google takes the position that the evidence demonstrates that rather than owing CNEX any money, it is undisputed that it is entitled to a payment from CNEX of $[redacted]. Pl. Mot. at 21–22.

**a. Financial Transactions**

As to the first element, it is uncontested that Google and CNEX engaged in financial transactions. However, Google contends that there is a dispute as to whether PFI has the right to collect on CNEX's indebtedness, because PFI has failed to produce any evidence that it acquired rights to CNEX's receivables. Pl. Mot. at 22. Google has met its moving burden to identify an absence of evidence in the record as to PFI's right to CNEX's receivables, and the burden shifts to PFI to identify disputed issues of fact for trial. In response, PFI points to its security agreement, which grants it a security interest in "all present and future [CNEX] Accounts." Security Agreement ¶¶ 2–3. As of March 19, 2026, PFI is also the owner of assets formerly belonging to CNEX via public auction. ECF No. 272-1, Ex. SS. The Court finds that PFI's evidence demonstrates its right to CNEX's receivables.

United States District Court
Northern District of California

**b. Accounting**

Google argues that PFI has never provided an accounting involved in the transaction. Pl. Mot. at 22. "A book account is a detailed statement of debit/credit transactions kept by a creditor in the regular course of business, and in a reasonably permanent manner." *Reigelsperger v. Siller*, 40 Cal. 4th 574, 579 n.5 (2007). Here, Google identifies a letter it sent to PFI's counsel requesting an accounting of the allegedly unpaid obligations, ECF No. 251-5, Ex. 74 at 265, but represents that it never received one. The Court finds that Google has met its burden to identify an absence of an accounting in the record, and the burden shifts to PFI to identify disputed factual issues for trial. In response, PFI identifies a spreadsheet it produced with a running accounting of Google invoices, including ones specifically marked as "unpaid." ECF No. 251-5, Ex. VV. PFI also submits PO '892, dated August 14, 2023, for $[redacted]. ECF No. 251-5, Ex. Z. PFI has offered evidence sufficient to support a reasonable conclusion that the spreadsheet and invoice reflect an amount owed by Google to CNEX, accrued over a series of transactions in the parties' course of dealing. *See Chamberlin v. Hartog, Baer & Hand, APC*, No. 19-cv-08243-JCS, 2022 WL 526157, at *22 (N.D. Cal. Feb. 22, 2022). Accordingly, the existence of an accounting is a disputed factual issue for trial.

**c. The Amount Owed, If Any**

Turning to the final two elements of the claim, namely whether Google owes CNEX money on the account and, if so, the amount owed, Google argues that it is undisputed that rather than it owing CNEX any money, it is undisputed that CNEX owes Google $[redacted]. Pl. Mot. at 23–24. PFI responds that Google's claimed offsets have nothing to do with the invoiced amount and the evidence establishes that Google owes an additional $[redacted]. Def. Opp. at 22–25.

As an initial matter, the parties *do* agree that in connection with Google's purchase order, [redacted] of the [redacted] Chips were completed and shipped to Google before CNEX ceased operations. *See* Pl. Mot. at 22; Def Opp. at 22; *see also* ECF No. 250-1, Ex. AA ("Google's Second Rog Responses") at 5 ("On April 1, 2024, CNEX issued Invoice 1634-2 to Google for $200,288 related to its delivery of [redacted] [chips]."). Other relevant facts, however, are in dispute.

For example, in support of its argument that offsets eliminate any debt Google owes CNEX, Google points to two key categories of payments it made. First, Google identifies evidence that it paid $[redacted] in Non-Recurring Engineering fees paid on CNEX's behalf, and that CNEX wrote Google confirming the overpayment was due and owed to Google. *See* Google's Second Rog Responses at 5; ECF No. 251-5, Ex. 79 (email from CNEX to Google, asking "[h]ow do you suggest that CNEX pays this $[redacted] back to Google?"). Google also claims that it was "forced" to pay a total of $[redacted] for third party expenses related to the manufacturing and testing of the Chip that CNEX was unable to pay. *See* Google's Second Rog Responses at 5; *see also* ECF No. 251-5, Exs. 80–84 (invoices). Accordingly, Google argues that CNEX is in debt to it, rather than the other way around. Pl. Mot. at 22. Yet in response, PFI points out that some of Google's own exhibits do not necessarily support Google's claimed offsets. Def. Opp. at 24. For example, in a June 2024 call between CNEX and PFI executives, CNEX's former CEO Bill Moore stated, talking about offsets, that, with respect to the amount owed on the outstanding purchase order, "the [redacted] dollars] is more like [redacted]." ECF No. 251-5, Ex. 32 at 36:53–37:00. In sum, the record contains conflicting evidence bearing on the existence and sum of the at-issue debts. The Court finds that Google has not met its moving burden to establish by undisputed facts that it does not owe CNEX any money.

* * *

Because there are disputed factual issues as to the existence of an accounting and as to whether Google owes CNEX money (and if so, the amount of the debt), Google's motion for summary judgment in connection with PFI's claim for open account is DENIED.

**2. PFI's Motion for Summary Judgment**

PFI also moves for summary judgment as to its claim for open account. It argues that the undisputed facts establish that Google received all [redacted] Chips ordered pursuant to PO '892 and accordingly owes CNEX the full amount reflected in the purchase order minus any offsets. Def. Mot. at 14–16. In the alternative, PFI moves for summary judgment in the amount of the unpaid invoice ($200,288). *Id.* at 16–17.

**a. PFI's Motion for Summary Judgment as to the Amount of the Unpaid Purchase Order Minus Offsets**

PFI first argues that Google received all [redacted] Chips ordered in PO '892, and therefore CNEX is entitled to payment as to the entire amount provided in the purchase order ($[redacted]), minus any offsets. Def. Mot. at 14–16. Although Google does not dispute that it owes CNEX $200,288 for the [redacted] chips delivered before CNEX closed its doors, Google disputes that the remaining [redacted] chips were ever processed, delivered, or invoiced. Pl. Opp. at 22–25.

PFI focuses its argument on evidence that, it contends, shows that Google received the remaining [redacted] Chips ordered in PO '892. For example, PFI identifies evidence that the remaining Chips were in the process of being manufactured when CNEX became insolvent and were eventually delivered to Google. *See* Def. Mot. at 15. Just to name one example, PFI submits CNEX's bank statements as evidence of pre-payments that CNEX made to one of the Vendors, which, it argues, supports a plausible inference that the remaining Chips were in the process of being manufactured when CNEX closed its doors. *See* ECF No. 250-1, Exs. BB, CC (CNEX's bank statements, which include line items indicating wire transfers to one of the Vendors). In response to this point, Google argues that PFI cannot tie the line items in CNEX's bank statements to the relevant purchase order, Google, or the [redacted] Project. *See* Pl. Opp. at 23–24. The Court agrees with Google that PFI's evidence does not establish that the remaining Chips were in the process of being manufactured. For example, as Google points out, while PFI's Exhibit BB shows that CNEX wired [redacted] money on October 4, 2023, in connection with "Invoice 0D711704E736," PFI does not explain how this payment connects to the instant dispute. *See* ECF No. 250-1, Ex. BB. For example, it is unclear what Invoice 0D711704E736 is. Although, in reply, PFI identifies evidence showing that this payment was likely for "prepay invoices for two lots," that evidence does not explain the connection between CNEX's payment to [redacted] and the dispute here. *See* Def. Reply at 12 (citing ECF No. 250-1, Ex. FF). Google also notes that delivery of Chips and a proper invoice are required to trigger Google's payment obligation, and the sole invoice in the record is the one the parties agree on (the invoice for $200,288). *See* MPA § 7.1 ("[redacted]"); *see also* ECF No. 251-5, Ex. 78 ("Invoice 1634").

United States District Court
Northern District of California

In sum, the Court finds that PFI has not met its moving burden to establish by undisputed facts that all of the Chips ordered in PO ’892 were delivered to Google. Thus, PFI’s motion for summary judgment as to the amount of the purchase order minus offsets is DENIED.

**b. PFI’s Alternative Motion for Judgment in the Amount of the Unpaid Invoice**

PFI moves in the alternative for judgment in the amount of the unpaid invoice: the $200,288 owed for [redacted] delivered Chips as set forth in Invoice 1634. Def. Mot. at 16. Because “Google does not dispute that amount is owed to CNEX,” Pl. Opp. at 23, the Court GRANTS PFI’s motion to the extent it seeks judgment in the amount of $200,288, subject to offsets to be determined at trial.

## IV. ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Google’s motion for partial summary judgment is GRANTED IN PART AND DENIED IN PART and PFI’s motion for summary judgment is GRANTED IN PART AND DENIED IN PART as follows:

(1) Google’s motion for summary judgment as to its claim for tortious interference with contractual relationships is GRANTED, subject to PFI’s affirmative defense of justification. In particular, there is a triable question of fact as to whether Google is a licensee in the ordinary course of business, and thus as to whether Google’s rights were extinguished in the disposition of CNEX’s collateral. PFI’s motion for summary judgment as to Google’s tortious interference claim is DENIED.

(2) PFI’s motion for summary judgment is DENIED as to Google’s trade secret claims with respect to the Customized Software and Tooling and GRANTED as to the final, manufactured Chips themselves.

(3) As to PFI’s unjust enrichment claim, Google’s motion for summary judgment is GRANTED and PFI’s motion for summary judgment is DENIED.

(4) Google’s motion for summary judgment as to PFI’s claim for declaratory judgment – future royalties is DENIED as contingent on the disputed factual question of whether Google is a licensee in the ordinary course of business.

United States District Court
Northern District of California

(5) Google's motion for summary judgment as to PFI's claim for declaratory judgment – voidable transaction is GRANTED.

(6) Google's and PFI's respective motions for summary judgment are DENIED as to PFI's claim for open account. PFI's partial motion for summary judgment as to the open account claim in the amount of the unpaid invoice ($200,288) is GRANTED, subject to offsets.

Dated: July 24, 2026

BETH LABSON FREEMAN
United States District Judge